# In re THREE MILE ISLAND LITIGATION.

## Civ. A. No. 79–0432.

United States District Court,
M. D. Pennsylvania.

July 10, 1980.

---

**27.** *See* note 25 *supra.*

David Berger, Berger & Montague, P. C., Philadelphia, Pa., for plaintiffs.

John G. Harkins, Jr., Esq., Pepper, Hamilton & Sheetz, Philadelphia, Pa., Fred Speaker, Pepper, Hamilton & Sheetz, Harrisburg, Pa., for defendants.

## MEMORANDUM

RAMBO, District Judge.

The events which led to this litigation began on March 28, 1979, with the nuclear incident at reactor number two of the Three Mile Island (TMI) nuclear facility located on an island in the Susquehanna River near Harrisburg, Pennsylvania. It is undisputed that during the course of the accident some radioactive materials escaped into the atmosphere, and that, in the ensuing days, thousands of residents left the area surrounding TMI out of concern for their safety.

On April 9, 1979, the first lawsuit was filed in this court. Numerous suits followed. Judge R. Dixon Herman, to whom the cases were then assigned,[1] referred them to United States Magistrate John Havas for pretrial organization and treatment.

On June 27, 1979, a consolidated class action complaint was filed.[2] There are sixty-seven plaintiffs named in the consolidat-

---

1. The TMI lawsuits were transferred to the undersigned judge in August of 1979.

2. At the time the complaint was filed, eighteen separate lawsuits seeking damages as a result of the TMI incident were on the docket. Similar cases, initiated after the filing of the consolidated class action complaint, have been combined with the class action.

ed class action complaint. These include individuals and businesses from the area surrounding TMI.

In September of 1979, counsel for plaintiffs and defendants filed a stipulation seeking class certification for two categories of plaintiffs. The classes were described as follows:

1. Class I consisting of all of those entities (including but not limited to proprietorships, unincorporated associations, partnerships, institutions, business and professional corporations, not-for-profit corporations, trusts and their successors in title or interest) having property, one or more places of business, or locations, within a twenty-five mile radius of Three Mile Island Reactor No. 2 ("TMI 2") which may have suffered economic harm allegedly related to the events occurring at TMI 2 commencing on or about 4:00 a. m. on March 28, 1979, and continuing thereafter, but excluding the defendants and any parents, subsidiaries, affiliates or other entities wholly or partially under defendants' control. (Business Class)

2. Class II consisting of all those natural persons residing, located, or having business, property, or occupational interests within a twenty-five mile radius of TMI 2 (at any time on or after approximately 4:00 a. m. on March 28, 1979) who may have suffered economic harm allegedly related to the events occurring at TMI 2 commencing on or about 4:00 a. m., on March 28, 1979, and continuing thereafter, but excluding officers, directors, and managing agents of defendants and of any of their corporate parents, subsidiaries, affiliates or other entities wholly or partially under defendants' control. (Individual-Economic Harm Class)[3]

Since the filing of the stipulation, plaintiffs have moved for certification of a third class of individuals. The proposed Class III definition encompasses:

All those individuals within a twenty-five mile radius of Three Mile Island who suffered personal injury, incurred medical expenses, are threatened with medical expenses and/or illness, suffered emotional distress and/or will require medical detection services, including independent inspections and surveys, for a reasonable number of years in the future to monitor the possibility of latent defects of said exposure, as a result of the nuclear incident which is the subject of this Complaint, but excluding Officers, Directors, and Managing Agents of the defendants themselves and of any subsidiaries and affiliates of defendants. (Physical-Emotional Harm Class)

Certification of this class is opposed by the defendants. A pretrial hearing was held to permit plaintiffs to present testimony supporting the motion to certify Class III. Subsequently, Magistrate Havas filed a report and recommendation on the contested matter of Class III certification. He suggested that certification be denied for the bulk of the Class III claims. However, he recommended certification of one issue common to the Class III plaintiffs, that of whether the plaintiffs are entitled to medical detection services.

Plaintiffs filed exceptions to the Magistrate's report. The court has reviewed the entire record de novo and will adopt the recommendations of the Magistrate for the reasons hereinafter stated. In adopting the Magistrate's recommendations, no opinion is expressed on the Magistrate's discussion of applicable Pennsylvania tort law.

## I. JURISDICTION

The federal district courts are courts of limited jurisdiction. They are empowered by Congress, through the authority of Article III, Section 1 of the Constitution, to hear only certain categories of cases. This court has raised, *sua sponte*, the issue of its

---

**3.** The "continuing thereafter" language in the Class I and II definitions is meant to refer to the period immediately following the TMI acci-

dent. Any claim for damages alleged to have occurred as a result of the decontamination of TMI 2, is not included in this definition.

**436**

jurisdiction to adjudicate the TMI damage action.

The Atomic Energy Act of 1954 [4] was passed to establish a legal framework for the development, use and control of atomic energy. In 1957 the Price-Anderson Act [5] added indemnity provisions to the Atomic Energy Act. It was the goal of Congress to establish a liability fund, with procedures governing claims against the fund, to facilitate the rapid and adequate financial compensation of individuals if there ever were a nuclear accident. [6]

The Price-Anderson Act has two provisions specifically conferring jurisdiction on federal trial courts. One provides that, when there has been a nuclear *incident,* "any indemnitor or other interested parties" may petition the federal district court for a determination as to whether the liability for the incident may exceed the coverage mandated by the act. 42 U.S.C. § 2210(*o*). Pursuant to this section, a federal district court might find it necessary to supervise distribution from the indemnity fund. Guidelines established in the act permit the court to give priority to some claims and to allow only a proportionate share of claims, if necessary, in a bankruptcy-like attempt to provide the most equitable allocation of the funds available. The federal court has the power to stay execution of state court judgments related to the nuclear incident at issue. Thus, a litigant might win a suit in state court only to be forced to await a federal decision as to what portion of the judgment could be paid in light of the overall liability situation.

The second jurisdictional section of the Price-Anderson Act provides in pertinent part:

(2) With respect to any public liability action arising out of or resulting from an extraordinary nuclear occurrence, the United States district court in the district where the extraordinary nuclear occurrence takes place . . . *shall have* original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant or of the Commission, any such action pending in any State court or United States district court shall be removed or transferred to the United States district court having venue under this sub-section. 42 U.S.C. § 2210(n)(2). (Emphasis supplied.)

Extraordinary nuclear occurrence is defined in the Atomic Energy Act at 42 U.S.C. § 2014(j) as follows:

The term "extraordinary nuclear occurrence" means any event causing a discharge or a dispersal of source, special nuclear, or by-product material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite. Any determination by the Commission that such an event has, or has not, occurred shall be final and conclusive, and no other official or any court shall have power or jurisdiction to review any such determination. The Commission shall establish criteria in writing setting forth the basis upon which such determination shall be made. [7]

Guided by the definition quoted above, the NRC has the responsibility to collect data from the incident and evaluate it in light of its established written criteria. The statute establishes no time limits within which the NRC must determine whether a particular accident is an extraordinary

**4.** Act of August 30, 1954 ch. 1073, 68 Stat. 919, as amended, 42 U.S.C. §§ 2011 through 2282.

**5.** Act of September 2, 1957, P.L. 85–256, 71 Stat. 576, 42 U.S.C. § 2210, as amended.

**6.** 1957 U. S. Code and Adm. News, p. 1803.

**7.** Originally the word "Commission" referred to the Atomic Energy Commission. The Energy Reorganization Act of 1974, Act of October 11, 1974, P.L. 93-438, § 2, 88 Stat. 1233, 42 U.S.C. § 5801, *et seq.,* transferred the regulatory functions of the Atomic Energy Commission to the Nuclear Regulatory Commission. 42 U.S.C. § 5841(f).

nuclear occurrence, or merely a nuclear incident.[8]

While the evaluation is ongoing, potential plaintiffs are in an unusual jurisdictional limbo. If the NRC finds that an extraordinary nuclear occurrence has transpired, the NRC or the defendant could move for removal of any pending state court actions concerning the occurrence to one federal district court. The act mandates that, upon motion, the transfer or removal be granted. 42 U.S.C. § 2210(n)(2). But the act is silent on the question of jurisdiction if the NRC finds that the incident does not qualify as an extraordinary nuclear occurrence. The unresolved issue is: Must a plaintiff who alleges that an incident qualifies as an extraordinary nuclear occurrence, and files in the appropriate federal district court, thereafter initiate suit in state court because the federal district court lacks jurisdiction once the NRC determines that the accident is not an extraordinary nuclear occurrence?

The parties to this action have suggested that, absent an extraordinary nuclear occurrence declaration, federal jurisdiction is also present under 28 U.S.C. § 1337(a), which reads as follows:

> The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. . . .

The Atomic Energy Act is unquestionably an act regulating commerce. 42 U.S.C. § 2012(c). The more perplexing question is whether it can be said that this action "arises under" the Atomic Energy Act inasmuch as the underlying causes of action derive from state tort law.

The history of the phrase "arising under" is long and tortured. *See*, Cohen, *The Broken Compass: The Requirement that a Case Arise "Directly" Under Federal Law*,

115 U.Pa.L.Rev. 890 (1967) and references cited therein for a comprehensive discussion of this topic. Cohen took his title from an opinion by Justice Cardozo. Cardozo cautioned that the compass in deciding an "arising under" question is the distinction between basic and collateral matters. *Gully v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). More recently the Third Circuit Court of Appeals held:

> An action arises under the laws of the United States if and only if the complaint seeks a remedy expressly granted by a federal law or if it requires the construction of a federal statute or a distinctive policy of a federal statute requires the application of federal legal principles for its disposition. *Lindy v. Lynn*, 501 F.2d 1367, 1369 (3rd Cir. 1974).[9]

The Supreme Court has spoken of the Price-Anderson Act as a substitute for state tort remedies. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 88, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595 (1978). Though the legislative history of the Price-Anderson Act indicates that Congress intended that state tort law be the basis of suits resulting from nuclear accidents, the act contains provisions which will interface significantly with the underlying state law even in the absence of an extraordinary nuclear occurrence declaration. Indeed, Congress expressly granted rights which would not be available under state tort law. 42 U.S.C. § 2210(m) permits insurers of nuclear facilities to give immediate financial assistance to injured parties after a nuclear incident. The statute provides that these payments are not admissions of liability, and requires that funds so paid be deemed partial satisfaction of final judgments later recovered by the recipients. Another section authorizes a United States district court to reserve money for "possible latent injury claims which may not be dis-

---

8. In the case of the accident at TMI, a final declaration was not issued until April 16, 1980, more than a year after the accident. The NRC found that the incident was not an extraordinary nuclear occurrence.

9. Though the Court in *Lindy* was ruling on a jurisdictional question under 28 U.S.C. § 1331 rather than 28 U.S.C. § 1337, the case law decisions interpreting the phrase "arising under" in the two statutes have been used interchangeably. *Serio v. Liss*, 300 F.2d 386 (3 Cir. 1961) (Footnote 3).

covered until a later time." 42 U.S.C. § 2210(o)(3). This provision implicitly abrogates the traditional state laws prohibiting the splitting of causes of action. Thus, it expands the scope of the state remedies available.

The unique jurisdictional provisions of the Price-Anderson Act have the potential to create a legal hiatus which could undermine one of the basic purposes of the act, that of expediting compensation for victims of nuclear accidents. This is possible because of the mandatory removal provision mentioned above. The NRC's decision on the classification of a particular nuclear accident may not be forthcoming for a number of months. Should a lawsuit with its origin in a potential extraordinary nuclear occurrence be filed in state court, the litigants might experience a substantial lapse of time in which the case proceeds in a court which will not handle the ultimate disposition of the matter. Discovery may have proceeded, motions may have been decided, or, as happened in this case, an evidentiary hearing may have been conducted. Thereafter, if removal occurs, the procedural rules would change in mid-case. Ordinarily removal occurs early in a lawsuit. The removal statute requires that the decision to take a case to federal court be made within thirty days of the time that a defendant learns he has been sued. 28 U.S.C. § 1446. Thus, at the outset, the case comes under procedural rules that will remain in effect throughout the action.

■ The Congressional Joint Committee on Atomic Energy stated, in its report on the Senate bill that became the Price-Anderson Act:

This committee has always been vitally concerned with protecting the health and safety of the public and employees from the potential hazards which accompany the beneficial applications of nuclear energy. The committee is equally determined that the promise to the public, contained in the Price-Anderson Act, will not prove to be an illusory one. It is the clear intent of this legislation that if a member of the public is ever injured by a nuclear incident, he will not be subjected to a series of substantive and procedural hurdles which would prevent the speedy satisfaction of a legitimate claim. S.Rept. No. 650, 89th Cong., 1st Sess., p. 13 *reprinted in* [1965] *U. S. Code Cong. & Admin. News,* pp. 3209, 3221.

Given the fact that more than a year elapsed between the incident at TMI and the NRC's announcement of its non-extraordinary nuclear occurrence determination, the intent of Congress can be realized only if the grant of jurisdiction under 28 U.S.C. § 1337(a) is used as a complement to the jurisdictional sections of the Price-Anderson Act. The federal legal principles embodied in the Price-Anderson Act, such as that permitting the splitting of a cause of action, will thereby be applied to effectuate the policy of expeditious compensation for victims of nuclear incidents.

A federal district court has jurisdiction, pursuant to 28 U.S.C. § 1337(a), over a lawsuit seeking damages from a nuclear incident of the magnitude of TMI. The Price-Anderson Act has an impact on such a case which makes the effect of the congressional regulation of commerce basic, not collateral. On Justice Cardozo's compass the needle points to federal jurisdiction "arising under" an act of Congress regulating commerce.

## II. CERTIFICATION OF CLASSES I AND II

The Magistrate did not consider the certification of Classes I and II because only the contested Class III certification motion was before him. The parties agree that the claims represented by Classes I and II should be treated as classes. Nevertheless, the court must ascertain that the proposed classes comply with the requirements of Federal Rule of Civil Procedure 23. The rule is designed so that a group wishing to proceed as a class must satisfy prerequisites found in the first section, which provides:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so

numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These will be discussed seriatum.

■ Classes I and II are limited by definition to economic harm. The damages will be primarily for loss of income, expenses of evacuation or preparation for evacuation, possible diminution in real estate value, and increased expenses for testing and/or destroying products which might have been contaminated. The Report on the Governor's Commission on Three Mile Island estimates that 39% of the population within a fifteen mile radius of TMI left the area for some period following the accident.[10] As a result, many businesses claim to have been affected by a decline in customers and a temporary loss of employees. Unquestionably, thousands of businesses and individuals fall within the ambit of Classes I and II, making joinder of all litigants impracticable.

The members of Classes I and II share some identical questions of law and fact. The causes of the mass evacuation, and the foreseeability of its fiscal impact on the local population and economy are examples of common legal issues. Factual matters such as the duration of the evacuation and its financial effect, i. e., types of economic damage rather than amounts, will be prevalent in both classes.

Plaintiffs named in the consolidated class action complaint represent a wide variety of businesses[11] and individuals from diverse

locales within a twenty-five mile radius of TMI. Their claims for business losses, depreciation in real estate value, and evacuation related expenses will be typical of the claims of Classes I and II.

The fourth prerequisite, that of adequate representation, is an aggregate of two factors. The attorneys representing the class must be qualified, experienced and generally able to conduct the litigation. In addition, the class representatives must not have interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). There are ten firms of attorneys that have combined their efforts to pursue the plaintiffs' claims. Resumes submitted to the court indicate that plaintiffs will be represented by capable and experienced counsel. At this stage of the litigation, it appears that the interests of the representative parties are in harmony with those of the class. The court is satisfied that the requirement of adequate representation is fulfilled.

Meeting the prerequisites of Rule 23(a) alone will not merit class certification. There must also be a finding that the class action is within one of the sub-sections of Rule 23(b). Subsection three is applicable to the relief sought by Classes I and II.[12] It provides in pertinent part:

(b) Class Actions Maintainable. An action may .be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

.     .     .     .     .

(3) the court finds that the questions of law or fact common to the members of

---

**10.** Report of the Governor's Commission on Three Mile Island, Presented to: Honorable Dick Thornburg, Governor, Commonwealth of Pennsylvania, February 26, 1980, p. 18.

**11.** Examples of the businesses of named plaintiffs are: manufacturing, real estate, auto repair, retail food, retail drug, book store, clothing stores, car wash, skating rink, automobile dealership, car rental, tax service, insurance, restaurant, racing association, and photo shop.

**12.** When the damages claimed must come from a limited fund, sometimes it is appropriate to certify a class action under Rule 23(b)(1)(B). However, the liability fund created pursuant to the Price-Anderson Act, 42 U.S.C. § 2210(e), though limited, is so large that the practical effect addressed in Rule 23(b)(1)(B) is not present. Also, it should be noted that Congress is committed by the act "to protect the public from the consequences of a disaster" that depletes the liability fund.

the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

For Classes I and II common questions of law and fact predominate over questions affecting only individual members. The common issues will relate to defendants' liability and will address questions such as: what happened, why, what types of damage were sustained by the plaintiffs, who was responsible, and were the damages foreseeable.[13] The questions affecting only individual members will be primarily those of damages. The Third Circuit Court of Appeals has stated: "[T]he necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Bogosian v. Gulf Oil Corporation*, 561 F.2d 434, 456 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Undoubtedly, the damage claims resulting from the TMI incident will have to be scrutinized individually. However, it is the judgment of this court that the common issues, including responsibility for the nuclear accident and the causes of subsequent economic dislocation, both individual and business, will be of greater significance than the uncommon issues.

Finally, the court shares the conviction of the parties that a class action is superior to other methods for the fair and efficient adjudication of the controversy. It is anticipated that the economic claims will number in the thousands. Evacuation expenses of individuals and some of the losses experienced by small businesses will be relatively modest. If each individual claim had to be prosecuted separately, the cost for some would be prohibitive in relation to the recovery. The class action device was designed to effect savings in legal expense and court time. Both should result from allowing Classes I and II to litigate their claims as a group.

## III. CERTIFICATION OF CLASS III [14]

The party moving for class certification has the burden of establishing that the proposed class meets the requirements of Federal Rule of Civil Procedure 23. *Manning v. Princeton Consumer Discount Company, Inc.*, 533 F.2d 102 (3rd Cir.), *cert. denied*, 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144, *reh. denied*, 429 U.S. 933, 97 S.Ct. 342, 50 L.Ed.2d 303 (1976). Plaintiffs' motion rests primarily on the testimony, at the hearing in November of 1979, of Joyce Elaine Bourinski, Beverly Ann Gorman and Terrill Schukraft. Each of them claimed some physical injury stemming from emotional distress attributed to the TMI incident. This portion of the Class III discussion will be limited to the question of certifying the physical injury claims which are linked with emotional distress.[15]

Mrs. Bourinski, who lives approximately three-and-a-half miles west of TMI, related that in April of 1979 her physician told her she was pregnant. She concluded that she had been in an early stage of pregnancy at the time of the March 28th incident. She was living close to TMI during the first two days following the accident and returned to her home a few times during a ten day period following the voluntary evacuation of her family on March 30. Worry over the potential for adverse effects on her fetus led her to consider having an abortion. Ultimately she and her husband decided that her pregnancy should be terminated. Since her abortion, Mrs. Bourinski has experienced continuing gyne-

13. It is likely that there will be a need to establish sub-classes, particularly to litigate causation for some of the business losses. However, within the sub-classes the major questions of causation and foreseeability will be the same.

14. While this opinion was in draft and undergoing revision, counsel forwarded to the court a proposed stipulation on the certification of Class III issues. The stipulation is under consideration. However, it will not affect the decision that the personal injury claims should not be tried as a class action.

15. No plaintiff claims present and apparent physical injury resulting directly from impact or exposure at the time of the accident.

cologic difficulties. Mrs. Bourinski testified that she suffered anguish over the termination of her pregnancy. She also expressed concern about the long-range health effect the incident will have upon her and her family.

Beverly Ann Gorman claims to have suffered emotionally and physically from the reactor incident. She said that, since March 28, 1979, she and her children have experienced diarrhea, headaches and nausea with greater frequency than ever before. Mrs. Gorman related that she fears for her future health and that of her children. This she said was the "main issue" with all her friends and customers.

Terrill Schukraft, the final witness to testify, owns and operates a boarding kennel for dogs at her home located seven miles east of TMI. Prior to March 28, 1979, she was under a doctor's care for elevated blood pressure. On March 29 she made a previously scheduled visit to her doctor, and discovered that her blood pressure had increased considerably. Since childhood Terrill Schukraft had experienced tachicardia, periodic excessive rapidity of her heart beat. She testified that over the weekend of March 30th, the rapid heart beat "was going all the time." Medication alleviated both the blood pressure and heart beat problems over a period of several weeks. Ms. Schukraft claims there is a relationship between the incident at TMI and the physical problems she experienced in late March and early April. She attributes the increased elevation of her blood pressure and the unusual incidence of rapid heart beat to emotional stress resulting from events at TMI.

On March 28, ten dogs were in residence at the Schukraft kennels. As word of the reactor incident spread, the dogs' owners phoned to say they would not be returning to the area. The owners asked Ms. Schukraft to continue to board their pets. At the same time other customers arrived. They wanted to lodge their dogs because they were leaving the area. Ms. Schukraft related:

All of a sudden I had 19 animals. And then they started talking about evacuating us. And I was within the 10 mile area. It would have been a forced evacuation.

What was I to do with all those dogs and goats? I had goats too. I don't have a truck. I have no means of transporting that many animals.

. . . . .

This was the beginning of the mental stress that I felt I was undergoing and about which I, I have to blame TMI, the incident. (NT, pp. 67, 68.)

It is not necessary to discuss Rule 23(a) prerequisites for certification here. Even if the proposed Class III plaintiffs could satisfy that section of the rule, certification would founder on the portion of Rule 23(b)(3) requiring a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The testimony of the three plaintiffs at the certification hearing demonstrates that the claims for emotional distress and resulting physical injury are diverse and personal. Mrs. Bourinski's decision to undergo an abortion has little in common with Ms. Schukraft's decision to board additional animals at the time of the TMI incident. Both claims would be subject to individualized defenses. Not only will damages have to be assessed on a plaintiff-by-plaintiff basis, so too will the causes of the injuries alleged. Many factors may lead to a decision to abort a fetus, hypertension is rarely traceable to a single occurrence, and certainly diarrhea, headaches and nausea have numerous origins.

In an anti-trust case, *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3rd Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the court held that, because one element of plaintiffs' prima facie case alleging illegal tying was necessarily the subject of individual proof, the claims should not have been certified for class treatment. Here the causation element of plaintiffs' physical injury/emotional distress claims will require individual

proof. In effect, the class action would break up into separate suits. Thus, a class action is not the superior method for adjudication of the claims for physical injury related to emotional distress.[16] *See,* Advisory Committee Note to the 1966 Revision of Rule 23(b)(3), reprinted at 39 F.R.D. 98, 103.

The proposed Class III definition submitted to the court includes a request for medical detection services to monitor for future manifestations of injury. The request is essentially one for money to provide the services and is a remedy rather than a cause of action.

■ Defendants argue that there is no legal basis for granting the relief because it is unsupported by a claim. A class certification ruling is not the appropriate vehicle for determining whether plaintiffs have stated a claim upon which relief can be granted. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). Exhibit A, accompanying plaintiffs' motion for certification of Class III, is a statement of the claims of the named plaintiffs. Many of the plaintiffs mention emotional distress and the possibility of latent injury. The justiciability of a latent injury claim is a question which will not be decided here.

■ The court is aware that there has been widespread concern among the population within a twenty-five mile radius of TMI over the possibility that there may be future physical problems caused by exposure to deleterious emissions from TMI. It believes that, if there is any legal basis for the claim or merit in it, the issues are

susceptible to class treatment. The class, when limited to the claimed need for medical monitoring, meets the criteria of Rule 23(a). The potential plaintiffs number in the tens of thousands, making joinder of all members of the class impracticable. As discussed below, there are numerous common factual issues, and the same legal issues concerning liability as exist for Classes I and II. The limited claim of the representative parties that their exposure to emissions from TMI warrants an award of damages for medical monitoring will be identical to those of the class. No apparent divergence of interest exists between the representatives and the proposed class.

The predominance of common issues required by Rule 23(b)(3) also exists. Beyond the question of causation there will be factual issues concerning the kinds and amounts of substances emitted during the accident, the likely pattern of their dispersal under the prevailing meteorological conditions, and what future physical effect the exposed population might expect. Since the facts and data will be the same for people residing in the same areas, a saving of time and expense can be realized by litigating this question as a class issue.[17] A class action will be the superior method of deciding whether there is any basis for granting the damages for medical detection services.

## ORDER

### IT IS HEREBY ORDERED THAT:

1. The recommendation of the Magistrate is adopted.

---

16. Plaintiffs, in their exceptions to the report of the Magistrate state:

> 6. The Report improperly focuses exclusively on the law of recovery for emotional suffering absent physical "impact" from the defendants' conduct. At issue in this case is whether radiation injury constitutes impact that takes plaintiffs' mental distress claims out of the "no-impact" class of cases altogether.

Even if plaintiffs were to prevail on an argument that exposure to radiation is impact under Pennsylvania law, the idiosyncratic nature of emotional distress claims makes them as unsuitable for class certification as the physical

injury/emotional distress claims discussed herein.

17. Rule 23(c)(4)(A) permits the maintenance of a class action to litigate particular issues even when some matters will have to be treated on an individual basis. It was added with the 1966 amendments so that the advantages of the class action could be realized in cases with a mixture of common and uncommon issues that are separable. *See* 7A Wright & Miller, *Federal Practice and Procedure* (1972) § 1790. Rule 23(c)(4)(B) authorizes the court to form subclasses. These will probably be necessary for Class III plaintiffs living in different localities.

2. Certification of Classes I and II is granted in accordance with the stipulation of the parties signed by the court this date.

3. Plaintiffs' motion for certification of Class III is denied.

4. The Class III issue of plaintiffs' right to medical detection services is certified pursuant to Federal Rule of Civil Procedure 23(c)(4)(A).

5. Lead counsel are to prepare and submit to the court their proposed notice forms.

6. The court will meet with David Berger, Esq., and John Harkins, Esq., at 10:00 a.m. on July 25, 1980 to discuss: (a) the Class III stipulation now under consideration; and (b) class notification.