THE PRESBYTERIAN CHURCH OF SU-
DAN, Rev. Matthew Mathian Deang,
Rev. James Koung Ninrew, Nuer Com-
munity Development Services in U.S.A.,
Fatuma Nyawang Garbang, Nyot Tot Ri-
eth, individually and on behalf on the
Estate of her husband Joseph Thiet
Makuac, Stephen Hoth, Stephen Kuina,
Chief Tunguar Kueigwong Rat, Luka
Ayuol Yol, Thomas Malual Kap, Puok
Bol Mut, Chief Patai Tut, Chief Peter
Ring Patai, Chief Gatluak Chiek Jang,
Yien Nyinar Riek, and Moris Bol Majok,
and on behalf of all others similarly
situated, Plaintiffs,

v.

TALISMAN ENERGY, INC., and
Republic of the Sudan,
Defendants.

No. 01 Civ.9882(DLC).

United States District Court,
S.D. New York.

March 25, 2005.

Carey R. D'Avino, Stephen A. Whinston, Keino R. Robinson, Berger & Montague, P.C., Philadelphia, Pennsylvania, Lawrence Kill, Linda Gerstel, Anderson, Kill & Olick, P.C., New York, New York, Steven E. Fineman, Rachel Geman, Daniel E. Seltz, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, New York, Elizabeth J. Cabraser, Richard M. Heimann, Bill Lann Lee, Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, California, for Plaintiffs.

Joseph P. Cyr, Marc J. Gottridge, Scott W. Reynolds, Lovells, New York, New York, for Defendants.

## OPINION AND ORDER

COTE, District Judge.

This case involves claims by current and former residents of southern Sudan who allege that they were victims of genocide, crimes against humanity, and other violations of international law at the hands of a Canadian energy company and the Government of Sudan. Specifically, the plaintiffs contend that the two defendants collaborated in a joint military strategy of ethnic cleansing against the plaintiffs for the purpose of creating a secure buffer zone that facilitated the development and exploitation of oil reserves in the Unity, Heglig, and Kaikang oilfields located in and around the Western Upper Nile region of Sudan. Following the denial of two motions to dismiss, the plaintiffs now

move for certification of a class. For the following reasons, the motion is denied.

## BACKGROUND

On November 8, 2001, the plaintiffs filed a class action complaint that was later amended on February 25, 2002. On May 13, defendant Talisman Energy, Inc. ("Talisman") filed a motion to dismiss the amended class action complaint that was denied by the late Honorable Allen G. Schwartz in an Opinion of March 19, 2003. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y.2003). On July 11, Talisman filed a second motion to dismiss the amended class action complaint that was later withdrawn and subsequently re-filed. On August 18, the plaintiffs filed a Second Amended Class Action Complaint ("Complaint"), in addition to a motion for certification of a class that was also later re-filed. The second motion to dismiss having been fully briefed on August 6, 2004, this Court denied the motion in an Opinion of August 27. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882(DLC), 2004 WL 1920978 (S.D.N.Y. Aug.27, 2004). The plaintiffs' motion for class certification was fully briefed on January 28, 2005. Fact discovery, which has proceeded since Judge Schwartz lifted a stay on December 24, 2002, concludes today.

### The Proposed Class

The plaintiffs seek certification pursuant to Rules 23(b)(2) and (b)(3), Fed.R.Civ.P., of a class consisting of

All non-Muslim, African Sudanese inhabitants of blocks 1, 2 or 4 or Unity State as far south as Leer and areas within ten miles thereof [the "Class Area"] at any time during the period January 1, 1997 to June 15, 2003 [the "Class Period"], who were injured during that period by acts of the Sudanese military or allied militia constituting genocide, extra-judicial killing, enslavement, forced displacement, attacks on civilians constituting war crimes, confiscation and destruction of property, torture or rape.

1. The Class definition differs from the description of the proposed class in the Complaint to the extent that the Complaint includes areas within

(The "Class").[1] In their class certification motion papers, the plaintiffs submit the declaration of Salem Mezhoud, a former Chief of the Sudan Desk in the United Nations Office of the High Commissioner for Human Rights and Deputy Chief of the United Nations Humanitarian Coordination Unit in Khartoum, Sudan, who states that the total population of the geographical area described in the Class definition was no more than 500,000, and that the total number of those people who would fall within the Class definition is within a range of 114,000 to 250,000.

### The Proposed Class Representatives

A description of the seventeen named plaintiffs reflects the range of injuries alleged by class members. It is, for that reason, set out in some detail.

The Presbyterian Church of Sudan (the "Church") is an unincorporated association of persons of the Presbyterian faith who are or were residents of Sudan. Its parishes are located in a broad area of the Upper Nile region in southern Sudan within and adjacent to the Unity and Heglig oilfields. The Complaint alleges that its churches have been bombed and destroyed, and church leaders and parishioners have been killed, tortured, raped, enslaved, and displaced by Sudanese Government ("Government") military forces because of their ethnic background or religion and their proximity to the oilfields.

Reverend Matthew Deang ("Deang") is a member of the Nuer tribe and a citizen of Sudan currently residing in Kenya as a refugee. Deang has held various leadership roles for many years in the Church, and is currently the Moderator of the Church for the Presbytery of Western Upper Nile. He supervises the 13 Church parishes in Western Upper Nile, which include 20 pastors and 390 congregations. His parish churches have been bombed and burned, his parishioners have been bombed, shot, tortured, raped, and displaced, and he has personally been attacked in locations including Koch, Bieh, and Wicok.

twenty-five miles of the defined geographic zone and includes a proposed class period ranging from 1990 to June 15, 2003.

Reverend James Koung Ninrew ("Ninrew") is a citizen of Sudan currently residing in Kenya as a refugee. Ninrew is a pastor of the Church, Secretary of the Church for the Presbytery of Western Upper Nile, and in charge of the Kock, Panijar, and Thornyor congregations. He has been displaced from a number of villages, and has endured Government attacks including aircraft bombings in Rier that killed 18 civilians, a January 2002 attack in Koch, and a February 2002 attack in Bieh that killed 22 civilians near a World Food Program distribution center.

Nuer Community Development Services in U.S.A. ("NCDS") is a non-profit corporation organized under the laws of Minnesota in 1999. NCDS members are refugees in the United States who fled areas within or adjacent to Talisman's oil concession as a result of the alleged ethnic cleansing campaign. NCDS members have had their properties destroyed or confiscated, and have relatives who have been victims of extrajudicial killings and kidnaping.

Fatuma Nyawang Garbang ("Garbang") is a citizen of Sudan currently residing in Illinois as a refugee. Garbang is a Nuer of the Bul tribe who was born and raised in Bentiu. She and her husband were driven out of their home in Leer in 1994 by Government attacks, and after seeking refuge in Kenya, attempted to return to Leer in 1997, 1998, and 1999. The Complaint alleges that repeated Government attacks in support of oil exploration activities in this area made a return to Leer impossible, particularly as many local villagers had been abducted and raped during those attacks.

Nyot Tot Rieth ("Rieth") is a citizen of Sudan currently residing in South Dakota as a refugee. Rieth is a member of the Nuer tribe who lived with her family in Leer. She and her family were subjected to aircraft bombings and helicopter gunship attacks several times a year from 1998 to 2002, and were forced to flee from their village into the bushland to avoid Government air and ground attacks. Rieth's husband, Joseph Thiet Makuac, was killed in the February 2002 attack in Bieh near the World Food Program distribution center, after which Rieth sought refuge in the United States with her two daughters.

Stephen Hoth ("Hoth") is a citizen of Sudan currently attending seminary school and residing in Nebraska. Hoth lived in Bentiu from 1987 to 1998. In 1999, Hoth's mother, Nyakl Phan, was killed in a Government militia attack that forced residents to flee the Bentiu region. Hoth received death threats during this time on account of his Christian religious beliefs and because he refused to join the Government-supported militia, and eventually fled to the United States.

Stephen Kuina ("Kuina") is a citizen of Sudan currently residing in Kenya as a refugee. Kuina experienced ten air and ground attacks by Government forces leading to his displacement and the death and displacement of other villagers. The first attack in April 1998 in Ruatanyibol killed Kuina's brother, Wecnyang, and the subsequent nine attacks at Pibor, Kerial, Byei (two occasions), Leer (two occasions), Toy, Tam, and Mayen Jur took place between 2000 and 2002.

Chief Tunguar Kueigwong Rat ("Rat") is a citizen of Sudan and the Paramount Chief of the Leek Nuer tribe. His tribe suffered attacks in 1999 that destroyed their villages of Buitouong, Tuong, Bentiu, Pakur, Wathjak, Kaluah, and Nyebulla. Rat led his tribe to seek refuge in the village of Nhialdiu, where Government attacks from 2000 to 2002 killed over one thousand tribe members, including his brother and other family members.

Luka Ayuol Yol ("Yol") is a citizen of Sudan currently residing in Ruweng County, Sudan. Yol is a member of the Dinka tribe, and is a Roman Catholic Catechist. In 1999, Yol was detained in Pariang by Government militias and tortured for two months. Since 2000, Yol has experienced ground attacks in the villages of Mankov, Dir, Chon Gonok, and Wun Majak, and experienced a series of air attacks in Wun Majak that killed nineteen people, including his brother Marial.

Chief Thomas Malual Kap ("Kap") is an Executive Chief of the Border in the Nuer tribe and a citizen of Sudan, currently residing in Koch County, Sudan. Kap led an exodus of his tribe members from the vil-

lages of Rier, Miermier, and Pultuni following attacks from Government soldiers involving indiscriminate killing and the abduction of young girls. He and his tribe members fled to the areas of Koch and Ngony, where they endured at least four different Government campaigns of violence, including air attacks in the villages of Reang, Paah, and Kulear in 1999, ground attacks in Ngony in 2001 that personally injured Kap, ground attacks in Ngony from 2001 to 2002, and ground attacks in the villages of Noorbor and Koulear from 2001 to 2002.

Puok Bol Mut ("Mut") is a member of the Nuer tribe and a citizen of Sudan who is a Civil Administrator currently residing in Mayom County, Sudan. Mut was displaced by ground attacks in the villages of Wangkei and Norriak in 1999. After fleeing to the village of Kualkuony, he experienced Government aircraft bombings there in 2000 and 2002 that killed fifty civilians, including Mut's uncle, severely injured others, including two of Mut's family members, and forced the refugees to flee to Leer.

Patai Tut ("Tut") is a citizen of Sudan and Chief of the Bul Gok Nuer tribe, currently residing in Mayom County, Sudan. Tut and his tribe members experienced air and ground attacks in the villages of Louth Juat, Wangkei, Chotjak, Mankien, Thargana, Tam, Buoth, Ngaryang, Keirla, and Kueiyean that forced his tribe members to seek refuge in the swampland south of Mankien. These attacks killed over one thousand members of the Bul Gok Nuer tribe, including Tut's niece. Examples of the attacks include a May 1999 helicopter gunship and Antonov bomber attack on Chotjak, Thargana, and Mankien, and a November 2000 helicopter attack on the trading center in Mankien that killed over sixty women and children and wounded over one hundred.

Peter Ring Patai ("Patai") is a citizen of Sudan and Chief of the Jikany Nuer tribe, currently residing in Wunliet village, Guest County, Sudan. Patai and his tribe members experienced air and ground attacks from 1999 to 2003 in the villages of Thor, Nimne, Duar, Chang, Juei, Dualkel, Pom, and Dwai that killed over one thousand tribe members and forced the survivors to flee to the village

of Wunliet. Examples of these attacks include a campaign from 1999 to 2000 against the villages of Thor, Nimne, and Duor, where Government forces destroyed and occupied the villages while an oil access road was constructed from Bentiu to Leer.

Gatluak Chiek Jang ("Jang") is a citizen of Sudan and Chief of the Leek Nuer tribe, currently residing in Rubkona County, Sudan. Jang and his tribe members experienced air and ground attacks and subsequent displacement from 1999 to 2003 in the villages of Koat, Boituong, Kumet, Rubnyaai, Iguei, Nyagorang, Jehzare, Bentiu, Pakur, Wathjak, Kaljak, and Njebolla. These attacks burned villages to the ground, killed over one thousand tribe members, including some of Jang's family members such as his brother, David Jung Chiek Jang, and wounded hundreds more.

Yien Nyinar Riek ("Riek") is a citizen of Sudan who currently lives in Rubkona County, Sudan. Riek and his fellow tribe members were displaced from the villages of Bouitong, Rubinyagai and Guei in 1999 after a combined Government air and ground attack. After fleeing to the village of Nhialdiu, Riek and his people suffered aerial attacks from May 1999 through the end of the year. Riek's brother and two nephews were killed by aerial bombardment in 2000. Government attacks in 2001 against the villages of Nhialdiu, Biel Cher, Wanglok, and Nyaromni displaced Riek and his family again, who fled to the villages of Tuarkil, Their, and Rier. Attacks against those villages in August 2002 forced Riek and his family to seek refuge in the border town of Tony.

Moris Bol Majok ("Majok") is a citizen of Sudan and a member of the Dinka tribe. Government militia attacks in 2000 drove Majok out of his home village of Abiemnom. After fleeing to Juk Kual, Majok experienced aerial bombardments in 2001 and 2002 that killed nine people. In July 2002, Government troops attacked Juk Kual. At that time, Majok was captured and tortured by Government troops, resulting in paralysis in his hands and legs.

*The Defendants*

Talisman is a public Canadian company headquartered in Calgary, Alberta, with shares traded on the New York and Toronto Stock Exchanges. Talisman is the largest independent Canadian oil producer, with operations during the proposed Class period in Canada, the North Sea, Indonesia, Sudan, the United States, Algeria, Trinidad, and Colombia. Talisman is also the successor in interest to Arakis Energy Corporation ("Arakis"), another Canadian company, and during the Class period held an interest in the Greater Nile Petroleum Operating Company, Ltd. ("GNPOC"). GNPOC was originally organized by the China National Petroleum Company ("CNPC"), which held a 40% interest; Petronas Carigali Overseas Sudan Berhad ("Petronas"), a subsidiary of Malaysia's state-run oil company which held a 30% interest; Arakis, which held a 25% interest that Talisman later assumed; and the Sudanese Petroleum Corp. ("Sudapet"), Sudan's state oil company, which held a 5% interest. GNPOC negotiated an interim oil exploration agreement with the Government of Sudan in December 1996, followed by a final agreement in mid–1997. Talisman acquired all of the assets and liabilities of Arakis, including its Sudanese operations, on October 8, 1998. Talisman sold its Sudanese operations to the Indian National Oil Company in March 2003. Talisman is alleged to have reaped approximately $1.5 billion in gross revenues while in possession of the concession.

Sudan is the largest country in Africa, and has a population of approximately 37 million. The population in the north is largely Arabic and Muslim, while the population in the south is largely non-Muslim and African, with most residents following either Christian or traditional African religious faiths.

Sudan is engaged in the commercial exploration and extraction of oil through Sudapet, and provides security services for foreign oil operations in Sudan, including Talisman. Under its agreement with Talisman, the Government received royalty payments constituting 39% of Talisman's revenues from its oil operations in 2000, payments which totaled $195 million. The Government's total oil revenues that year reached $526 million.

An affidavit of service on Sudan of the Summons, Amended Complaint, and Notice of Suit was filed on December 4, 2002. Sudan has not entered an appearance. Before this case was transferred to this Court, Sudan's ambassador to the United Nations transmitted a fax dated December 26, 2002 to the Hon. Allen G. Schwartz, asserting that Sudan enjoys sovereign immunity in this case and stating that it "does not intend to appear or participate in the lawsuit in any manner." Judge Schwartz issued a Memorandum Order of March 19, 2003 reserving decision on whether Sudan is entitled to immunity given that neither side had briefed the issue, and warning that "[i]n order to avoid the risk of suffering a default, Sudan must enter an appearance and formally move to dismiss for lack of jurisdiction." The plaintiffs have not moved for a default judgment.

*Relevant History*

Sudan achieved independence from Great Britain and Egypt in 1956. As colonial forces withdrew from Sudanese territory, southern units of the Sudanese army mutinied against the newly independent government in Khartoum, which was dominated by northern Arab political elites. Civil war continued for over a decade until the 1972 Addis Ababa Peace Agreement ("1972 Agreement"), which gave southern Sudan a degree of self-determination. In 1979, four years after receiving an exploration concession, Chevron discovered oil in the Upper Nile province of southern Sudan; the following year, President Nimieri sought to redraw the border of the province so that more of the oil reserves would fall under direct northern control. The Khartoum government later abrogated the 1972 Agreement and decreed that Islamic law, or *Shari'ia,* would be imposed on the entire country. Consequently, civil war erupted again in 1983.

A military coup against the Khartoum government in 1989 led to the ascendancy of a Taliban-style fundamentalist Islamic political group known as the National Islamic Front. According to the Complaint, since the coup, the Government has dramatically intensified the religious and ethnic persecution of non-Muslim Sudanese. The Complaint asserts that as of the beginning of the Class period,

the conflict evolved into an "oil war" for control over Sudan's petroleum resources. Beyond an internal oil war, however, the Complaint posits a perversely symbiotic partnership between foreign oil companies and the Government, such that the Government could only receive capital from the development of its oil reserves to expand its war against the southern population by turning to foreign oil companies with the technology to develop the reserves successfully, while foreign oil companies could only develop the oil reserves successfully under secure conditions generated by assisting the Government in waging war against its southern population. Finally, the Complaint also relies on the Sudan Peace Act, Pub.L. No. 107–245, 116 Stat. 1503 (2002), which states that "the acts of the Government of Sudan, including the acts described in this section, constitute genocide as defined by the Convention on the Prevention and Punishment of the Crime of Genocide," *id.* § 2(10), and that the Government is using attacks "as a systematic means to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples in a policy of low-intensity ethnic cleansing." *Id.* § 4(2).

In its opposition to class certification, Talisman argues that the relevant historical facts include extensive inter-tribal warfare in southern Sudan that Talisman claims had nothing to do with its oil extraction presence. It emphasizes that when civil war returned to Sudan in 1983, it was initially waged against the Government principally by the rebel Sudan People's Liberation Army ("SPLA") led by John Garang ("Garang"). According to Talisman, in 1991, the SPLA split into two competing factions, the Nuer tribe-dominated South Sudan Independence Movement/Army ("SSIM/A") led by Riek Machar ("Machar"), and the Dinka tribe-dominated Sudan Peoples' Liberation Movement/Army ("SPLM/A")[2] led by Garang. These two groups struggled for control of southern Sudan against each other, as well as the Government, from 1991 until 1997. Talisman

quotes a number of international monitoring reports that indicate that the civilian death toll and incidence of war crimes may have been higher in inter-tribal warfare than it was in attacks from Government forces during that time. Part of the reason for this statistic was that rebel forces largely consolidated control over southern Sudan during the time period.

Talisman argues that in April 1997, the Government, SSIM/A, and a number of smaller rebel groups entered into the Khartoum Peace Agreement ("Khartoum Agreement"), which provided for an overall ceasefire, commitments of equal treatment by the Government regardless of gender, race, religion, color, or origin, wealth and power sharing between the north and the south, and a consolidation of the smaller rebel groups and SSIM/A into a new group led by Machar called the South Sudan Defense Force ("SSDF"). By virtue of the Khartoum Agreement, SSDF was aligned with the Government and was intended to coordinate its military operations with Government forces. Talisman alleges that although Garang did not sign the Khartoum Agreement on behalf of SPLM/A,[3] the Khartoum Agreement nevertheless produced a window of peace that led to Talisman's decision to invest in the oil concessions in the region.

By 1998, SSDF began to split into warring factions when Machar's preferred candidate for Governor of Unity State, Taban Deng Gai, won the election over the objection of one of Machar's senior commanders, Paulino Matiep ("Matiep"). Matiep led a breakaway faction named the South Sudan United Movement ("SSUM") that the Government recognized and permitted to maintain a separate military presence from SSDF. Talisman alleges that Machar objected to such recognition, abrogated the Khartoum Agreement, and re-established his movement against the Government, SSUM, and SPLM/A with what

---

**2.** Apparently because SPLM/A was originally part of the SPLA, and it continued to be led by Garang, some sources continue to refer to it as the "SPLA," treating SSIM/A as a splinter group.

**3.** It appears from documents submitted by Talisman in connection with its opposition, including

a re-published copy of the Khartoum Agreement with an Editor's Introduction, that Commander Kerbino Kuanyin Bol signed the Agreement on behalf of the Bahr el-Gazal Group sector of the SPLM/A. This group, however, may represent a different faction from the SPLM/A led by Garang.

remained of SSDF, which he re-named the Sudan People's Defense Force/Democratic Front ("SPDF"). Meanwhile, in late 1999, one of Matiep's SSUM commanders, Peter Gadet ("Gadet"), defected with a number of SSUM fighters to join Garang's SPLM/A. Conflict erupted between SSUM and SPLM/A. By early 2000, the Khartoum Agreement had completely collapsed. Talisman's opposition to the plaintiffs' motion thus places particular emphasis on inter-tribal warfare from 1999 to 2000, and contends that the victimization of civilians was commonplace in the ongoing struggle for regional power between Government forces, Garang's and Gadet's SPLM/A, Matiep's SSUM, and Machar's SPDF.

*Geography of Sudan Oil Reserves*

After oil was first discovered by Chevron in southern Sudan in 1979, major discoveries were made in the Unity area north of Bentiu in the Upper Nile province in 1980 and the Heglig area in the Southern Kordofan province in 1982. After several attempts to exploit its concession in the 1980s that were interrupted by the killing of several of its workers, Chevron sold the concession to Arakis in 1990. The oil reserves in the Muglad Basin, the geological zone which includes what became Talisman's concession, is of a heavy viscous quality requiring sophisticated extraction and processing technology only available from advanced western oil companies. The Complaint asserts that these oil fields could not be developed without removing the local population.

The Government granted concessions to explore and extract oil in this region by dividing it into numbered "blocks," although most of the rural areas within these blocks had not been under Government control since the civil war resumed in the early 1980s. Consequently, the Complaint states that from the outset, Arakis, and later Talisman, were aware that military action would be required to secure the concession for oil exploration and extraction.

After GNPOC was formed, each of its members took responsibility for specific tasks. Talisman became the principal entity in charge of exploration and production in Blocks 1, 2, and 4. The total area of these blocks consisted of 130,000 acres of "developed" land, with proven oil reserves, and nearly 12 million acres of "undeveloped" land with no proven oil reserves. Block 1, or the Unity oilfield, is north of the town of Bentiu and is the southern terminus of the Sudan oil pipeline, which runs to the Red Sea in northeast Sudan. Block 2, or the Heglig oilfield, is adjacent to Block 1, and, along with Block 1, is located in Ruweng County. Block 4, or the Kaikang oilfield, is a larger block to the south and west of Blocks 1 and 2. During the Class period, all of these blocks were inhabited primarily by ethnic Dinka and Nuer tribe members who are African and who follow either Christian or traditional African religious faiths.

*Relevant Alleged Conduct*

The following facts are drawn from the Complaint. The Complaint alleges that Talisman was aware, because of negotiations and due diligence activities associated with acquiring Arakis in 1998, of the well-established nature of Arakis's relationship with the Sudanese military, that Arakis employed private as well as Government forces to protect its oil operations, that Arakis repaired Government military vehicles and supplied Government military bases in the region in exchange for military protection, and that any oil development project in Sudan would entail military operations against the civilian population by a regime that flagrantly and systematically abused human rights. Despite this knowledge, Talisman assumed Arakis's interests on October 1998, and engaged in an aggressive expansion of its Sudanese operations, quickly developing the Unity and Heglig oilfields.

*Joint Planning and Coordination of Military Operations*

By August 1999, the Sudanese oil pipeline was completed and functioning. During this time, Talisman allegedly hired its own private military advisors and worked with the Government to devise a plan to secure the oilfields and their facilities. This plan included operations to attack the civilian populations living near the pipeline, as well as in areas where Talisman wanted to drill, in order to create a secure, depopulated buffer

zone around those areas. Planning activities regularly included meetings between Talisman officials, Government Army intelligence officials, and representatives of the Ministry of Energy and Mining, which controlled Sudan's specially dedicated Petroleum Security forces. At those meetings, Talisman would map out areas it intended to explore, and the parties would then discuss how to "dispose of" the civilians living in those areas. Talisman allegedly was aware that the result of those decisions was to cause genocide and war crimes as Government-affiliated armed forces destroyed villages and killed, maimed, raped, and tortured civilians of ethnic and religious minority backgrounds. One document quoted in the Complaint, a May 7, 1999 communication marked "very urgent" from the Petroleum Security forces' central Khartoum office to its Heglig office stated: "In accordance with directives of His Excellency the Minister of Energy and Mining *and fulfilling the request of the Canadian Company* . . . the armed forces will conduct cleaning up operations in all villages from Heglig to Pariang." (Emphasis in Complaint). The Complaint also describes a pattern of Government military operations against civilian targets immediately preceding announcements by Talisman that it was expanding its drilling operations into those same areas. This pattern was well-documented by reports from numerous governmental and non-governmental monitoring organizations, including the U.S.-led Civilian Protection Monitoring Team, which found "deliberate depopulation along the oil road."

Attacks were carried out by the regular Sudanese Army, its allied regional militias, and Petroleum Security forces. The Complaint alleges that the military operations have resulted in widespread death, rape, and torture, the enslavement of thousands, vast destruction of property, and the displacement of over 100,000 civilians from Al Wahdah, or Unity State, in the western Upper Nile region. The number of displaced persons alleged in the Complaint is, by comparison, a small subset of the approximately four million total internally displaced persons in all of Sudan.

*Financial Support*

The Complaint alleges that Talisman paid the Government directly, or through GNPOC, for military "protection" of its oil activities, with knowledge that such protection entailed systematic attacks on civilians. It is unclear whether the plaintiffs are alleging that these "protection" fees were paid independently of the royalties that Talisman paid to the Government from its oil revenues.

*Technical and Logistical Support*

To support its oil operations, Talisman purchased trucks, installed communications facilities, chartered aircraft and helicopters, and constructed and maintained roads and airports. Government forces used such facilities and equipment to carry out military operations against civilians with Talisman's knowledge. For example, Talisman and GNPOC built a network of all-weather roads that could withstand southern Sudan's tempestuous rainy season and that facilitated the depopulation efforts of Government military forces year-round. Conversely, the Government's depopulation efforts themselves facilitated Talisman's construction of the roads. In connection with this expansion, GNPOC gave fifty camouflaged transport vehicles to Government forces in Bentiu at the end of 1998. In addition, when Talisman planned to expand its drilling locations, it provided material support to Government forces to construct new military garrisons in those areas.

Talisman also expanded dirt airstrips in the Heglig and Unity oilfields into longer, paved runways that could support military transport planes and bombers in all seasons. Not only was Talisman aware that these airstrips would be used as bases of operations for Government attacks on civilians, it also actively assisted the Government by transporting army officials on Talisman flights to and from the bases, and by using Talisman-chartered helicopters to ferry Government militia commanders and ammunition to field operations in the region. The Complaint cites numerous international reports that documented the military operations staged from Talisman oil concessions and that were published contemporaneously with those operations.

Moreover, the Complaint alleges that shortly after assuming Arakis's interests, Talisman Chief Executive Officer James Buckee met with local Sudanese officials, proposing to provide funding to educate and train southern Sudanese residents to work for Talisman. The Government rejected this proposal, and instead, Talisman allocated the funding to a security training program used to bring Government security personnel to Canada for training.

*Causes of Action*

The Complaint contains one cause of action: that the defendants' actions violated, or aided and abetted the violation of, the law of nations and customary international law relating to "genocide, torture, war crimes, crimes against humanity and the treatment of ethnic and religious minorities and their property." The Complaint advances theories of liability including failure to investigate by Talisman, willful participation in the above-mentioned violations by both defendants, conspiracy to commit the violations by both defendants, aiding and abetting by Talisman, and unjust enrichment by both defendants as a result of the violations.

## DISCUSSION

In deciding whether a class should be certified, the court determines whether the requirements of Rule 23 are met, not whether the claims are adequately pleaded or who will prevail on the merits. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The plaintiffs bear the burden of satisfying Rule 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999). A court must conduct a "rigorous analysis" to determine that the Rule 23 requirements have been satisfied and a class should be certified, but a decision to certify a class is "not an occasion for examination of the merits of the case." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir.2001) (citation omitted).

To qualify for certification, plaintiffs must prove that the proposed class action meets the four requirements of Rule 23(a). *See id.*

at 132. Rule 23(a) provides that class members may sue as class representatives only if

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a), Fed.R.Civ.P.

Plaintiffs must also establish that the class action may proceed under one of the categories of Rule 23(b). *In re Visa Check/Master-Money*, 280 F.3d at 133. In this case, plaintiffs seek certification of the class pursuant to Rule 23(b)(2) and (b)(3). Under Rule 23(b)(2), a class may be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2), Fed.R.Civ.P. Certification under Rule 23(b)(2) is not appropriate, however, "in cases in which the appropriate final relief relates exclusively or predominantly to money damages." *In re Visa Check/MasterMoney*, 280 F.3d at 146 (citation omitted).

Under Rule 23(b)(3) a class may be certified if, in addition to the requirements of Rule 23(a),

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(3), Fed.R.Civ.P. The Rule 23(b)(3) predominance inquiry is more demanding than the commonality determination required by Rule 23(a). *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002). Rule 23(b)(3) is designed for actions that will "secure judgments binding all class members save those who affirmatively elect[ ] to be excluded," and where a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrific-

ing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 614–15, 117 S.Ct. 2231 (citation omitted). The court must look closely at each of the Rule 23(b)(3) criteria. *Id.* at 615, 117 S.Ct. 2231.

This Opinion first addresses certification issues pertaining to Rule 23(a) and 23(b)(2). These issues are less central to the certification motion, as Talisman all but concedes that each element of Rule 23(a) is satisfied, while the plaintiffs' Rule 23(b)(2) argument is manifestly contrary to the established law of this Circuit. This Opinion then turns to certification issues pertaining to Rule 23(b)(3). Because the plaintiffs have not shown that common issues of law and fact predominate, certification under Rule 23(b)(3) must also be denied. As a consequence, it is unnecessary to address Talisman's additional arguments that adequate notice cannot be given to largely illiterate Class members in rural, sub-Saharan Africa, and that a judgment in this case may not have a *res judicata* effect in other countries.

### A. *Rule 23(a) Requirements*

#### (1) *Numerosity*

■ To satisfy the numerosity requirement of Rule 23(a), plaintiffs must show that joinder is "impracticable," not that it is "impossible." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). Numerosity is presumed when a class consists of forty or more members. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995). It is uncontested that more than 100,000 people are putative Class members.

#### (2) *Commonality*

■ Rule 23(a) also requires that the action raise an issue of law or fact that is common to the class. *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (*per curiam*); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987). The commonality and typicality requirements of Rule 23(a) tend to merge into one another, as both "serve as guideposts for determining whether ... the named plaintiff's claim and the

class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *Caridad*, 191 F.3d at 291 (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

Plaintiffs have identified numerous common questions of law and fact. Common questions of fact include whether Talisman and the Government jointly planned a military strategy to displace tribal groups forcibly from oil exploration areas, and whether Talisman provided tactical, logistical, technical, and financial support for the Government's military campaigns against civilian targets. Common questions of law include whether Talisman's conduct with respect to the Class rises to the level of a violation of the law of nations.

#### (3) *Typicality*

■ The typicality requirement of Rule 23(a) is satisfied when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson*, 267 F.3d at 155 (citation omitted); *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992). The factual background of each named plaintiff's claim need not be identical to that of all of the class members as long as "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad*, 191 F.3d at 293 (citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936–37. Together, the typicality and commonality requirements help to ensure that "maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in

their absence." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

The course of conduct alleged by the plaintiffs represents a sweeping and coordinated campaign of violence against civilians in and around oil concessions held by Talisman. As alleged, this campaign was executed pursuant to a policy developed through collaboration between the defendants in order to depopulate areas that were ripe for oil extraction. The claims of the named plaintiffs arise from that course of conduct and are typical of the claims of the Class. The conduct was directed at, and affected, the named plaintiffs as well as unnamed Class members, and the injuries caused to both groups were essentially the same. Both groups will necessarily seek to develop facts sufficient to prove the existence of the policy of depopulation, as well as its synchronized development and execution by Talisman and the Government acting in concert.

#### (4) *Adequacy of Representation*

■ To determine whether a named plaintiff will be an adequate class representative, courts inquire whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa,* 222 F.3d at 60; *see also Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364; *In re Visa Check/MasterMoney,* 280 F.3d at 142; *In re Drexel Burnham,* 960 F.2d at 291. A class representative must "possess the same interest and suffer the same injury as the class members." *Amchem,* 521 U.S. at 625–26, 117 S.Ct. 2231 (citation omitted). The requirement that the named plaintiffs adequately represent the class "is satisfied as long as one of the class representatives is an adequate class representative." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 n. 2 (9th Cir.2001).

Both *Baffa* criteria are satisfied. The named plaintiffs' interests are directly aligned with those of the absent class members: they have all experienced the same types of injuries as a result of the same policy of ethnic cleansing perpetrated by the same defendants. Their attorneys are qualified, experienced, and able to conduct complex litigation.

Talisman contests the qualifications of four of the proposed Class representatives. First, it claims that the Church and NCDS as organizations have standing to sue only for property damage claims in their individual capacities, but do not have standing to sue on behalf of their members. Second, it claims that Hoth and Garbang are inadequate Class representatives because they only spent a negligible amount of time in the putative Class area during the Class period, were not personally injured, and because Garbang gave duplicitous deposition testimony. Because the defendants do not contest the adequacy of each Class representative, it is unnecessary to decide whether and in what capacity these four parties will function as Class representatives in order to rule on the certification motion. Decision with respect to these four parties is therefore reserved.

#### B. *Rule 23(b)(2) Requirements*

■ Class certification under Rule 23(b)(2) is appropriate where defendants have acted on grounds generally applicable to the class, making final injunctive or declaratory relief appropriate. Rule 23(b)(2), Fed.R.Civ.P. Certification under Rule 23(b)(2) is not appropriate, however, "in cases in which the appropriate final relief relates exclusively or predominantly to money damages." *In re Visa Check/MasterMoney,* 280 F.3d at 146 (citation omitted). Rule 23(b)(2) is intended for circumstances where "broad, class-wide injunctive or declaratory relief is *necessary* to redress a group-wide injury." *Robinson,* 267 F.3d at 162 (emphasis supplied).

Where a claim seeks both injunctive relief as well as monetary damages, a district court must consider "the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Id.* at 164. Even though this requires "ad hoc balancing" that varies from case to case depending on the circumstances, Rule 23(b)(2) requires a court to determine, at a minimum, that "even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief

sought," and that "the injunctive or declaratory relief sought would be both *reasonably necessary and appropriate* were the plaintiffs to succeed on the merits." *Id.* (emphasis supplied). "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

■ The plaintiffs clothe their claim for relief in the vestments associated with equitable claims. The plaintiffs seek a constructive trust through disgorgement of Talisman's profits or revenues acquired through their alleged participation in violations of international law. Talisman no longer owns any interest in GNPOC and, since it sold its interest, has not engaged in any oil exploration in Sudan. The obvious form of injunctive relief that plaintiffs would be expected to seek—enjoining Talisman from participating in oil exploration and extraction activities in Sudan—is therefore not at issue here.[4] The plaintiffs' request for a constructive trust is an ill-disguised claim for damages. Consequently, the plaintiffs' request is precisely the sort of sham request for injunctive relief that the Second Circuit has stated cannot support a Rule 23(b)(2) certification.

### C. *Rule 23(b)(3) Requirement: Common Questions Predominate*

Under Rule 23(b)(3), a class may be certified only where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Rule 23(b)(3), Fed. R.Civ.P. This requirement is "more demanding" than the commonality requirement of Rule 23(a). *Moore*, 306 F.3d at 1252. *See also Amchem*, 521 U.S. at 624, 117 S.Ct. 2231. Rule 23(b)(3) is intended "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other unde-

sirable results." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231. The predominance requirement evaluates whether a proposed class is cohesive enough to merit adjudication by representation. *See Moore*, 306 F.3d at 1252. Predominance will be established if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* Consequently, to determine whether common questions of law or fact predominate, a court must focus "on the legal or factual questions that qualify each class member's case as a genuine controversy . . . [and] test[ ] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231; *see also In re Visa Check/MasterMoney*, 280 F.3d at 135.

Where plaintiffs are "allegedly aggrieved by a single policy of the defendants" in a case with "strong commonality of the violation and the harm," this can be "precisely the type of situation for which the class action device is suited." *In re Visa Check/MasterMoney*, 280 F.3d at 146. Ordinarily, without such commonality of violation and harm, "a common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff." *Moore*, 306 F.3d at 1255 (declining to certify a class in a fraud action in the absence of materially uniform misrepresentations). On the other hand, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check/MasterMoney*, 280 F.3d at 138 (citation omitted). *See also Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir.2003).

Rule 23(b)(3) lists some of the factors pertinent to the Rule's predominance and superiority inquiries as including

---

4. The plaintiffs point out that they sought an injunction in their original complaint, and amended their complaint to drop the injunction claim and to add a disgorgement claim only once Talisman sold its Sudanese oil interest. If Talis-man were still involved in oil exploration in the Sudan, and an injunction were still being sought, then the request for Rule 23(b)(2) certification would have to be considered more closely.

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3), Fed.R.Civ.P. These factors are intended to encourage courts to consider "the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." *Amchem,* 521 U.S. at 616, 117 S.Ct. 2231.

> The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable.

*Id.* "Each plaintiff in an action involving claims for personal injury and death has a significant interest in individually controlling the prosecution of his case; each has a substantial stake in making individual decisions on whether and when to settle." *Id.* (citation omitted). This interest in individual control is important where each prospective class member's "will and *ability* to take care of himself are strong." *Id.* (citation omitted) (emphasis supplied). Although Rule 23(b)(3) does not foreclose certification in cases where "individual damages run high," the rule's drafters "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem,* 521 U.S. at 617, 117 S.Ct. 2231. On their own, individualized damage issues rarely prevent certification. *See In re Visa Check/MasterMoney,* 280 F.3d at 139.

### (1) *Alien Tort Statute Litigation*

This appears to be the first occasion a federal court has ruled on class certification, under Rule 23(b)(3), of an action seeking damages for genocide or crimes against humanity.[5] The modern usage of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350,[6] as a means for private vindication of alleged gross human rights abuses, was initially driven by individual allegations of torture perpetrated by government officials, *see, e.g., Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2d Cir.1980), as well as individual allegations of summary execution and prolonged arbitrary detention, *see, e.g., Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1535, 1538 (N.D.Cal.1987).

Individual claims have continued to play a central role in ATS litigation. *See, e.g., Sosa v. Alvarez–Machain,* —— U.S. ——, ——, 124 S.Ct. 2739, 2746, 159 L.Ed.2d 718 (2004) (individual claim of United States government-sponsored abduction); *Rasul v. Bush,* —— U.S. ——, —— –– ——, 124 S.Ct. 2686, 2690–91, 159 L.Ed.2d 548 (2004) (individual claims of unlawful detention perpetrated by the United States government); *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 91 (2d Cir.2000) (individual claims of torture and extrajudicial killing perpetrated by Nigerian government officials);[7] *Abebe–Jira v. Nege-*

---

**5.** In another putative ATS class action pending in this District, an unpublished Report and Recommendation by Magistrate Judge Henry Pitman recommends denying class certification under Rule 23(b)(3) in an action seeking damages for crimes against humanity against an energy company related to its operations in Nigeria. *Kiobel v. Royal Dutch Petroleum Co.,* No. 02 Civ. 7618(KMW), slip op. (S.D.N.Y. Mar. 31, 2004) (Report & Recommendation). The district court has not ruled on the class certification motion.

**6.** This Opinion refers to the statute as the Alien Tort Statute following the example of the Supreme Court in *Sosa v. Alvarez–Machain,* ——

U.S. ——, ——, 124 S.Ct. 2739, 2746, 159 L.Ed.2d 718 (2004), and the Second Circuit in *Filartiga v. Pena–Irala,* 630 F.2d 876, 879 (2d Cir.1980). It should be noted, however, that the Second Circuit and other courts have also called the statute the Alien Tort Claims Act, *see, e.g., Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003), as well as the Alien Tort Act, *see, e.g., Kadic v. Karadzic,* 70 F.3d 232, 236 (2d Cir.1995).

**7.** The related case mentioned *supra* at n. 5, *Kiobel v. Royal Dutch Petroleum Co.,* No. 02 Civ. 7618(KMW), was filed on September 20, 2002, and is styled as a class action.

*wo,* 72 F.3d 844, 845 (11th Cir.1996) (individual claims of torture and cruel, inhuman, and degrading treatment perpetrated by Ethiopian government official); *Carmichael v. United Techs. Corp.,* 835 F.2d 109, 113–14 (5th Cir.1988) (individual claim of torture perpetrated by Saudi Arabian government and aided by corporation); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 91 (D.D.C.2003) (individual claims by representatives of victims of terrorist attacks of September 11, 2001); *Sinaltrainal v. Coca–Cola Co.,* 256 F.Supp.2d 1345, 1348 (S.D.Fla.2003) (individual claim of extrajudicial killing perpetrated by Colombian paramilitary organization and corporations); *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1081–82 (S.D.Fla.1997) (individual and corporate claim of Bolivian government-sponsored wrongful imprisonment and extortion); *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1191 (S.D.N.Y.1996) (individual claim of torture perpetrated by Ghanaian government security official); *Xuncax v. Gramajo,* 886 F.Supp. 162, 169 (D.Mass.1995) (individual claims of torture, arbitrary detention, summary execution, and disappearance perpetrated by Guatemalan government military forces); *Paul v. Avril,* 901 F.Supp. 330, 331 (S.D.Fla.1994) (individual claims of torture and false imprisonment perpetrated by Haitian head of state); *Lafontant v. Aristide,* 844 F.Supp. 128, 129–130 (E.D.N.Y.1994) (individual claim of extrajudicial killing perpetrated by Haitian head of state).

The individual claims have included claims of genocide, war crimes, and crimes against humanity. *See, e.g., Cabello v. Fernandez–Larios,* No. 04–10030, 402 F.3d 1148, 1151–52, 2005 WL 580533, at *1 (11th Cir. Mar.14, 2005) (individual claim of extrajudicial killing, torture, crimes against humanity, and cruel, inhuman, or degrading treatment perpetrated by Chilean military officer); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1144 (E.D.Cal.2004) (individual claim of extrajudicial killing and crimes against humanity perpetrated by former chief of security for El Salvadoran paramilitary groups); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1344 (N.D.Ga.2002) (individual claims of torture, cruel, inhuman, or degrading treatment, arbitrary detention, war crimes, and crimes against humanity

perpetrated by police officer in former Yugoslavia); *Doe v. Islamic Salvation Front,* 993 F.Supp. 3, 5–6 (D.D.C.1998) (individual claims of crimes against humanity and war crimes perpetrated by political party and terrorist group during Algerian civil war); *Mushikiwabo v. Barayagwiza,* No. 94 Civ. 3627(JSM), 1996 WL 164496, at *1–2 (S.D.N.Y. Apr.9, 1996) (individual claims of torture, extrajudicial killing, and genocide perpetrated by Rwandan government official).

Individual claims have also provided a vehicle for more novel substantive ATS allegations, many of which have not proceeded beyond the pleading stage, such as damages for pollution-related illnesses, *see Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003), conducting business in an apartheid regime, *see In re South African Apartheid Litig.,* 346 F.Supp.2d 538, 549 (S.D.N.Y.2004), libel, bribery, and corruption, *see Maugein v. Newmont Mining Corp.,* 298 F.Supp.2d 1124, 1130 (D.Colo.2004), fraud, conversion, and misrepresentation, *see Arndt v. UBS AG,* 342 F.Supp.2d 132, 141 (E.D.N.Y.2004), violations of privacy and the disturbing of burial sites, *see Weiss v. Am. Jewish Comm.,* 335 F.Supp.2d 469, 476 (S.D.N.Y.2004); price fixing, *see Kruman v. Christie's Int'l PLC,* 129 F.Supp.2d 620, 627 (S.D.N.Y.2001), *aff'd in part and vacated in part by* 284 F.3d 384 (2d Cir.2002), and corporate misrepresentations, *see Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668, 669 (S.D.N.Y.1991).

More recently, a second strand of ATS litigation has developed that involves cases styled as class action lawsuits. Although a wide array of such cases has been filed, few have been considered by district courts for class certification.

In many cases, the complaints were dismissed or otherwise disposed of before a certification motion could be filed or ruled upon. *See, e.g., Hoang Van Tu v. Koster,* 364 F.3d 1196, 1199 (10th Cir.2004) (affirming statute of limitations dismissal of putative class's ATS claim by victims of My Lai massacre); *Bano v. Union Carbide Corp.,* 361 F.3d 696, 717 (2d Cir.2004) (reinstating and

remanding property damage claims from foreign chemical disaster to district court for a determination of whether class certification is appropriate); *In re Agent Orange Prod. Liab. Litig.*, Nos. MDL 381, 04–CV–400 (JBW), 2005 WL 555582, at *17 (E.D.N.Y. Mar. 10, 2005) (dismissing claims of Vietnamese nationals against herbicide manufacturers without ruling on class certification motion); *Berriochoa Lopez v. United States*, 309 F.Supp.2d 22, 23 n. 1 (D.D.C.2004) (dismissing complaint against United States for violations of free trade agreement without ruling on class certification motion); *Bao Ge v. Li Peng*, 201 F.Supp.2d 14, 17 (D.D.C.2000) (dismissing complaint against Chinese government and multinational corporation for slave labor in prison camps); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 432 n. 1 (D.N.J. 1999) (dismissing World War II forced labor complaint without addressing class certification); *Aguinda v. Texaco, Inc.*, 142 F.Supp.2d 534, 541 (S.D.N.Y.2001), *aff'd* 303 F.3d 470 (2d Cir.2002) (dismissing Ecuadoran environmental ATS complaint before considering class certification); *Alomang v. Freeport–McMoran Inc.*, Civ. A. No. 96–2139, 1996 WL 601431, at *1 (E.D.La. Oct.17, 1996) (remanding ATS claims of various human rights abuses, "cultural genocide," and environmental violations against a mining corporation in Indonesia to state court before deciding class certification motion).[8]

In other cases, a certification motion was never filed. *See, e.g., Doe I v. Liu Qi*, 349 F.Supp.2d 1258, 1270 (N.D.Cal.2004) (Falun Gong members alleged torture and cruel, inhuman, and degrading treatment at the hand of Chinese government officials); *In re African–American Slave Descendants Litig.*, 304 F.Supp.2d 1027, 1039 n. 16, 1070 (N.D.Ill. 2004) (dismissing claim by descendants of slaves in the United States seeking reparations); *Tachiona v. Mugabe*, 216 F.Supp.2d 262, 269 n. 1 (S.D.N.Y.2002) (entering default judgment against ruling political party in Zimbabwe for individual plaintiffs claiming damages for politically-motivated torture and extrajudicial killing);[9] *Bodner v. Banque Paribas*, 114 F.Supp.2d 117, 138 (E.D.N.Y. 2000) (denying motions to dismiss by French banks accused of participation in scheme to expropriate assets of Jewish customers during Nazi occupation and continuing to retain such assets); *Hirsh v. Israel*, 962 F.Supp. 377, 378 n. 1 (S.D.N.Y.1997) (dismissing complaint by Holocaust survivors to recover reparation payments made from Germany to Israel pursuant to a treaty between the two countries).

There are apparently only four ATS cases where a federal court has decided a class certification motion in a published opinion; on three occasions, the court certified a class. Of these, only one certification was pursuant to Rule 23(b)(3).[10] In *Does I v. The Gap, Inc.*, No. CV–01–0031, 2002 WL 1000073 (D.N. Mar. I. May 10, 2002), the court granted a motion for class certification under Rule 23(b)(3)[11] for approximately 30,000 factory garment workers in Saipan, Northern Mariana Islands, who alleged that they were held in a system of peonage and involuntary servitude created through a conspiracy among garment manufacturers in the district. *Id.* at *2, 9.[12] The court rejected the defendants'

---

**8.** In a related case, class certification was apparently denied without prejudice in an unpublished opinion, *see Alomang*, 1996 WL 601431, at *1, and had not been granted at the time the case was dismissed. *See Beanal v. Free-port McMoRan, Inc.*, 969 F.Supp. 362, 365 (E.D.La.1997).

**9.** *See also Tachiona v. United States*, 386 F.3d 205, 208 (2d Cir.2004).

**10.** It would appear that class certification was also granted pursuant to Rule 23(b)(3) in an unpublished decision on either April 24, 1998, or August 24, 1998, in *Brown v. Esmor Correctional Servs., Inc.*, 215 F.R.D. 477 (D.N.J.2003). *Compare Jama v. U.S. Immigration and Naturalization Serv.*, 343 F.Supp.2d 338, 346 (D.N.J.2004), *with DaSilva v. Esmor Correctional Servs., Inc.*, 215

F.R.D. 477, 478 (D.N.J.2003). These ATS cases involve allegations of torture and other cruel treatment of asylum seekers at a privately-run U.S. detention facility.

The defendants point to the unpublished Report and Recommendation described *supra* at n. 5. *Kiobel*, No. 02 Civ. 7618(KMW), slip op. (S.D.N.Y. Mar. 31, 2004).

**11.** The court also stated that the case met the requirements for certification under Rules 23(b)(1) and (b)(2), *see The Gap*, 2002 WL 1000073, at *5, 6.

**12.** The class definition was: "All persons other than Saipan resident citizens who, at any time since January 13, 1989, have been employed on

472

argument that "at least one element of each of the plaintiffs' claims requires individualized proof and inquiry into the plaintiffs' mental states, alleged injuries, and causes of the alleged injuries." *Id.* at *7. Rather, the court held that "this is a lawsuit challenging the garment production system on Saipan based upon allegations of peonage, not a case involving 30,000 individual tort actions." *Id.* The court considered the evidence of both economic and non-economic damages to be class-wide proof. *Id.* Consequently, the court found that common issues would predominate over individual issues because it would be unnecessary to engage in "the separate adjudication of each class members' individual claim or defense." *Id.*

The remaining two certifications were pursuant to Rule 23(b)(1)(B). In *Doe I v. Karadzic*, 176 F.R.D. 458 (S.D.N.Y.1997), the court certified a plaintiff class pursuant to the "limited fund" provision of Rule 23(b)(1)(B), reserving decision on whether members of the class should be allowed to opt out. *Id.* at 463. The plaintiffs alleged that they were victims of genocide, war crimes, and crimes against humanity in Bosnia–Herzegovina at the hands of the self-proclaimed leader of the territory during a civil war. The plaintiffs had also sought certification pursuant to Rule 23(b)(3). The court expressed "grave doubts" about plaintiffs' ability to demonstrate that common questions of law and fact would predominate and that the proposed class action would be manageable, but it did not reach the merits of those questions. *Id.*

In *Hilao v. Estate of Marcos*, an action by Philippine citizens against the estate of the former president for torture, extrajudicial killing, and disappearance, the district court certified a class of plaintiffs [13] in an unpublished April 8, 1991 decision pursuant to the "limited fund" provision of Rule 23(b)(1)(B). *See Hilao v. Estate of Marcos*, 393 F.3d 987, 989 (9th Cir.2004); *In re Estate of Ferdinand Marcos Human Rights Litig.*, 25 F.3d 1467, 1469 (9th Cir.1994); *Doe v. Karadzic*, 192 F.R.D. 133, 141 n. 12 (S.D.N.Y.2000). Following a three-phase trial on liability, punitive damages, and compensatory damages that ran from 1986 to 1995, *see In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 910 F.Supp. 1460, 1462 (D.Haw.1995); *Hilao*, 103 F.3d at 782, the Ninth Circuit approved the class certification decision, rejecting the defendant's objections that the class was too broadly defined to provide effective notice, and that the class representatives' claims were not typical of the class. *Hilao*, 103 F.3d at 774. On the typicality point, the court held that "[a]s to whether any particular injury was caused by Marcos' act or omission, this question was resolved by the liability finding ... that Marcos was liable for any act of torture, summary execution, or 'disappearance' committed by the military or paramilitary forces on his orders or with his knowledge." *Id.*

In addressing the defendant's challenge to the method for awarding compensatory damages to class members, the Ninth Circuit grappled with the fact that the jury's liability finding did not establish proximate causation for all of the class members.[14] Indeed, only

Saipan as factory garment workers for one or more of the Contractor Defendants." *The Gap*, 2002 WL 1000073, at *1.

13. The class was defined as follows:
All current civilian citizens of the Republic of the Philippines, their heirs and beneficiaries, who between 1972 and 1986 were tortured, summarily executed or disappeared while in the custody of military or paramilitary groups. *Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir.1996).

14. The jury was given the following proximate cause instruction during the liability phase of the trial:
To determine the Estate of the late President Marcos is liable to any plaintiff for wrong

alleged by the plaintiffs, you must determine whether the injury alleged by a plaintiff has been shown by a preponderance of the evidence to have been *caused by reason of a person being taken into custody by an order of Ferdinand Marcos or under his authority.*
*Hilao*, 103 F.3d at 779 (emphasis supplied). The defendant argued on appeal that "the jury might have found it liable for a plaintiff's injuries only on the basis of the plaintiff being taken into custody on Marcos' authority, even if intervening causes were actually responsible for the injuries." *Id.*

The Ninth Circuit held, however, that because the proximate cause instruction immediately followed the main liability instruction that "required the jury to find either that Marcos had 'directed, ordered, conspired with, or aided' in

at the compensatory damages phase of the trial, where a Special Master conducted an inquiry in the Philippines, was evidence of proximate cause for class members gathered. *Id.* at 782–83 & n. 8.[15] The Special Master took the depositions, which had been noticed in accordance with the Federal Rules of Civil Procedure, of 137 randomly selected claimants from the total pool of 9,541 facially valid claims as determined by the district court. *Id.* at 782. This sample was intended to reflect an accurate percentage of the types of harms suffered by the claimants, the percentage of claimants with varying severity of harms, and the percentage of claimants who had suffered harms at the hands of Marcos government forces, as opposed to other individuals. *Id.* at 782–83. These percentages were used to project a total damages award that would take into account the percentage of remaining invalid claims, as well as variations in the types and severity of abuses suffered by claimants. *Id.* at 783. A federal jury then tried the compensatory damages issue, modifying the special master's conclusions in a number of ways. *Id.* at 784.

The Ninth Circuit noted the "profound" concerns of the Fifth Circuit with a similar procedure in an asbestos case, *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir.1990), rooted in the statistical certainty that such a procedure would ensure that some invalid claims would receive a recovery, thereby reducing the recovery for some class members with valid claims compared to the recovery they would have received had they pursued their claims individually, and that the defendants would be exposed to liability not just to claimants whose cases were tried, but to many additional claimants "whose claims were indexed to those tried." *Hilao,* 103 F.3d at 785. Nevertheless, the court rejected these concerns, contending that individual

trials of all 9,541 claims would be "impossible," that the risk of invalid claims was small, that the defendant's payout was already reduced to reflect the existence of a number of invalid claims, and that the procedure was "justified by the extraordinarily unusual nature of this case." *Id.* at 786.

In a thoughtful dissent, Judge Rymer wrote that "determining causation as well as damages by inferential statistics instead of individualized proof raises more than 'serious questions' of due process." *Id.* at 787 (Rymer, J., dissenting). Judge Rymer continued:

> *Even in the context of a class action, individual causation and individual damages must still be proved individually.* ... Although such generic causation and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by the defendant's conduct. [I] cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages. The main problem on review stems from a failure to differentiate between the general and the particular. This is an understandably easy trap to fall into in mass tort litigation. Although many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis. *There is little question that Marcos caused tremendous harm to many people, but the question is which people,*

torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it," the instructions therefore clearly required the jury "to find not merely that the plaintiffs were taken into custody under Marcos' authority but that once in custody the plaintiffs were tortured, executed, or disappeared on Marcos' orders or with his knowledge." *Id.*

15. In her dissent, Judge Rymer noted that the special master's charge was to determine:

(1) whether the abuse claimed came within one of the definitions, with which the Court charged the jury at the trial held in Hawaii, of torture, summary execution, or disappearance; (2) whether the Philippine military or paramilitary was or were involved in such abuse; and (3) whether the abuse occurred during the period September 1972 through February 1986.

*Hilao,* 103 F.3d at 787 (Rymer, J., dissenting).

*and how much.* That, I think, is a question on which the defendant has a right to due process.

*Id.* at 788 (Rymer, J., dissenting) (emphasis supplied) (citation omitted).

Finally, in *Doe I v. Unocal Corp.,* 67 F.Supp.2d 1140 (C.D.Cal.1999), the court denied a motion for class certification under Rule 23(b)(2) in an ATS case brought by a putative class of Burmese citizens who sought to enjoin a United States petroleum corporation from participating in an oil pipeline construction project in Myanmar (Burma). *Id.* at 1147. The court found that the plaintiffs, who had alleged that they were victims of forced labor, forced relocation, and various forms of cruel, inhuman, and degrading treatment in connection with the pipeline construction project,[16] did not have standing to seek injunctive relief because an injunction against the corporation would be unlikely to redress their injuries given that "the cessation of these alleged illegal acts would depend on the independent actions of companies and governmental entities who are not parties to this lawsuit." *Id. See also Doe I v. Unocal Corp.,* 395 F.3d 932, 943, 954 n. 31, 955 (9th Cir.2002), *reh'g en banc granted by* 395 F.3d 978 (9th Cir.2003).

### (2) Mass Tort Litigation

Class certification decisions in mass tort cases offer additional guidance in analyzing the predominance of common questions over individual issues in a case in which class members have suffered physical injuries. Of particular relevance are three categories of mass tort cases: pollution or "toxic tort" cases, product liability cases, and mass accident cases. Following a discussion of the Supreme Court's landmark decision in this area, decisions of note in each of these three areas will be discussed.

The leading Supreme Court case in the field of mass tort class certification is *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In *Amchem,* asbestos manufacturers and plaintiffs sought approval of a comprehensive settlement package that would provide a mandatory claims resolution procedure for all current and future asbestos-related personal injury claims. The Court held that the requirement under Rule 23(b)(3) that common questions predominate over individual issues was not met, because although class members shared the common experience of exposure to asbestos, they "were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods." *Id.* at 624, 117 S.Ct. 2231 (citation omitted). Contrasting claims for consumer or securities fraud or antitrust violations, where the predominance test is "readily met," the Court observed that ordinarily, certification in mass tort cases is "not appropriate." *Id.* at 625, 117 S.Ct. 2231 (citing Advisory Committee Notes to Rule 23, Fed.R.Civ.P., 28 U.S.C.App., at 697). On the other hand, "mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement." *Id.* While the rule "does not categorically exclude mass tort cases from

**16.** The court noted that plaintiffs initially sought certification of a class consisting of:

all residents of the Tenasserim region of Burma (bounded on the north by the town of Ye; on the south by the town of Tavoy; on the west by the coastline and offshore islands; and on the east by the Thai/Burmese border) who have been, are, or will be forced to relocate their place of residence, and/or contribute labor and/or property and/or subject to the death of family members, assault, rape or other torture, and other human rights violations in furtherance of the Yadana gas pipeline project in *which defendants are joint venturers.*

*Unocal,* 67 F.Supp.2d at 1141. At the Court's request, plaintiffs submitted the following revised proposed class definition:

The class consists of all residents of the Tenasserim region of Burma (bounded on the north by latitudinal line of 15 degrees 15 minutes North; on the south by the latitudinal line of 13 degrees, 30 minutes North; on the west by the coastline and offshore islands; and on the east by the Thai/Burmese border) who have been, are, or will be subject to the following acts in furtherance of the Yadana gas pipeline project in which defendants are joint venturers: forced relocation, forced labor, torture, violence against women, arbitrary arrest and detention, cruel, inhuman or degrading treatment, crimes against humanity, the death of *family members, battery, false imprisonment,* assault, negligent hiring, or negligent supervision.

*Id.*

class certification," courts considering certification motions should exercise "caution when individual stakes are high and disparities among class members great." *Id.*

The passage in the Advisory Committee Notes to which the Court in *Amchem* referred reads as follows:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Advisory Committee Notes to Rule 23, Fed. R.Civ.P., 28 U.S.C.App., at 697.

### Toxic Tort Cases

Even before the Supreme Court's decision in *Amchem*, the Fifth Circuit expressed doubts regarding whether defendants' right to a jury trial in a mass asbestos litigation would be honored with probabilistic evidence that artificially closed the causation loop through "phased" trials. In *In re Fibreboard Corp.*, 893 F.2d 706, 710–12 (5th Cir. 1990), it reversed the decision certifying a class under Rule 23(b)(3), finding that the use of a trial of class representatives' claims to determine actual damages for the entire class presented a variety of problems, including the following:

> This type of procedure does not allow proof that a particular defendant's asbestos "really" caused a particular plaintiff's disease; the only "fact" that can be proved is that *in most cases* the defendant's asbestos *would have been* the cause. This is the inevitable consequence of treating discrete claims as fungible claims. Commonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury. Procedures can be devised to implement

such generalizations, but not without alteration of substantive principle.

*Id.* at 712 (emphasis in original). *See also Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 319–20 (5th Cir.1998) (because causation issues must be tried individually, rejecting judgments based on extrapolation evidence).

More recently, in *Mejdrech v. Met–Coil Sys. Corp.,* 319 F.3d 910 (7th Cir.2003), the Seventh Circuit affirmed the Rule 23(b)(3) certification of a class of approximately 1,000 homeowners suing a factory owner for soil and groundwater contamination from a leaking storage tank that was located within a mile or two of their homes. *Id.* at 910–11. *See LeClercq v. Lockformer Co.,* No. 00 C 7164, 2001 WL 199840, at *6–7 (N.D.Ill. Feb. 28, 2001). The district court limited class treatment to the issues of whether and to what extent the tank contaminated the area in question. *Mejdrech,* 319 F.3d at 911. Individual hearings were to follow on the issues of whether a particular class member suffered a harm and the amount of injury. *Id.* In *Mejdrech,* Judge Posner observed that

> [i]f there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

*Id.*

Likewise, in *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988), the Sixth Circuit affirmed certification, pursuant to Rule 23(b)(3), of a class of plaintiffs suing a chemical manufacturer for personal injuries and property damage resulting from living near the company's chemical waste burial site. *Id.* at 1197. It emphasized that in a mass tort accident case, "the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next." *Id.* at 1197. Class members would still have to submit evidence individually, however, in subsequent damages proceedings. *Id.* A Rule 23(b)(3) class has also been certified in a case of pesticide spraying where the spraying was confined in space

and time, coinciding with a die-off of a local lobster population, *Fox v. Cheminova, Inc.,* 213 F.R.D. 113, 129 (E.D.N.Y.2003), but not in a case where the plaintiffs complained of repeated episodes of spraying in different areas and under different circumstances, *Rink v. Cheminova,* 203 F.R.D. 648, 666–67 (M.D.Fla.2001).

The Second Circuit has also spoken in the context of toxic tort litigation. In *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145 (2d Cir.1987), where armed forces personnel asserted injury from exposure to the herbicide Agent Orange in Vietnam, the court affirmed the district court's certification of a plaintiff class under Rule 23(b)(3) despite extreme skepticism that common issues would predominate.[17] It overcame that skepticism solely because of its finding that the military contractor defense was so central to the case. *Id.* at 166. The court observed that if the action had been brought by civilians, a class could not have been certified. *Id.* As it explained, the causation issue

> is highly individualistic, and depends upon the characteristics of individual plaintiffs (*e.g.* state of health, lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

*Id.* at 165.

*Product Liability Cases*

Product liability cases also present significant challenges for Rule 23(b)(3) certification because individual causation issues usually present a barrier to a finding that common issues will predominate. For example, in the context of medical device product liability litigation over penile prostheses, the Sixth Circuit reversed the certification of a Rule 23(b)(3) class, observing that the factual and legal issues differed dramatically from individual to individual "because there is no common cause of injury." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1084 (6th Cir.1996). In such a case, there is "[n]o single happening or accident" to cause similar types of physical harm or property damage. *Id.* (citation omitted). For this same reason, "[n]o one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant." *Id.* (citation omitted). *See also Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1233 (9th Cir.1996) (reversing certification of Rule 23(b)(3) class in products liability litigation over epilepsy drug); *In re Rezulin Prod. Liab. Litig.,* 210 F.R.D. 61, 66, 71 (S.D.N.Y. 2002) (denying class certification motion under Rule 23(b)(3) in products liability litigation over diabetes drug).

*Mass Accident Cases*

A final example of the use of Rule 23(b)(3) certification in mass tort litigation is in the area of mass accidents. Depending on the cohesiveness of the class, courts have certified the action. In train and airplane crashes, for example, although courts do not by any means always certify classes, *see, e.g., Marchesi v. Eastern Airlines, Inc.,* 68 F.R.D. 500, 501–02 (E.D.N.Y.1975), they have on occasion found that common issues predominate sufficiently to warrant Rule 23(b)(3) certification. In *Sala v. Nat'l R.R. Passenger Corp.,* 120 F.R.D. 494 (E.D.Pa.1988), the court certified a class action for the passengers on a train that derailed, noting that "each class member will offer precisely the

---

17. The Hon. George C. Pratt certified a Rule 23(b)(3) class because the interest of class members in individually controlling the prosecution of separate actions was minimal at the earliest stages of the litigation where plaintiffs had to confront the government contract defense asserting that the defendants were protected by the doctrine of sovereign immunity and the *Feres/Stencel* doctrine. *In re Agent Orange Prod. Liab. Litig.,* 506 F.Supp. 762, 790, 792 (E.D.N.Y. 1980). Judge Pratt acknowledged that later stages of the litigation, "especially those concerned with individual causation and damages," may require decertification. *Id.* at 790. Three years later, the Hon. Jack B. Weinstein, to whom the case was reassigned, certified a Rule 23(b)(3) class, finding that issues of "general" causation could be tried at a plenary trial, and that the issues of "specific" causation could be determined at separate trials for individual plaintiffs. *In re Agent Orange Prod. Liab. Litig.,* 100 F.R.D. 718, 724 (E.D.N.Y.1983).

same proof to establish defendant Amtrak's alleged liability towards and breach of duty to the passengers traveling on The Night Owl on January 29, 1988." *Id.* at 499. The court also emphasized not only that common facts generated the claims of the class members, but that causation could reasonably be derived from those facts and applied to the class generally. *Id.*

Class certification under Rule 23(b)(3) has also been granted in the case of mass accidents that extend beyond transportation disasters. In *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir.1992), the Fifth Circuit affirmed certification of a plaintiff class of over 18,000 in connection with the explosion of an oil refinery that caused significant damage in surrounding communities. *Id.* at 1017. The trial plan involved four phases, with common issues of punitive damage liability to be resolved first. In the third phase, a separate jury would determine the issues unique to a plaintiff's claim, including causation and compensatory damages. The trials were to be conducted in waves of groups of five plaintiffs who shared a common relationship to the disaster. *Id.* at 1018. The Fifth Circuit found that the issues to be tried in phase one were so integral to each plaintiff's claim that there could be "no serious contention" that Rule 23(b)(3)'s predominance requirement had not been met. *Id.* at 1022–23.

In the aftermath of the nuclear reactor incident at Three Mile Island, the court certified Rule 23(b)(3) classes of individuals suffering economic harms from evacuations, but refused to certify a class of individuals who claimed physical injuries linked to emotional distress because those claims were "diverse and personal." *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441 (M.D.Pa.1980). The court noted that "the causation element of plaintiffs' physical injury/emotional distress claims will require individual proof. In effect, the class action would break up into separate suits." *Id.* at 441–42.

As this body of law shows, Rule 23(b)(3) certification is generally granted in a tort case where there is a demonstrated cohesiveness of the class due to a shared experience that is confined in time and place and produces similar effects. Where these elements are not present, certification is usually denied.

### (3) *Plaintiffs' Causes of Action*

To apply the principles embodied in Rule 23 to the motion for class certification, it is necessary to define the elements of the causes of action on which the plaintiffs are proceeding.[18] To do so, this Opinion draws from international conventions and treaties, customs and practices observed and accepted by states as international law, "general principles" of law recognized by "civilized nations," and, as a subsidiary source, the writings of jurists and scholars. *See Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 156–57 (2d Cir.2003). *See also* Statute of the International Court of Justice, June 26, 1945, art. 38, 59 Stat. 1055, 1060, 33 U.N.T.S. 993; Restatement (Third) of Foreign Relations Law § 102 (1987).[19]

"Whether a rule has become international law is determined by evidence appropriate to the particular source from which that rule is alleged to derive." Restatement (Third) of

---

**18.** Within the single cause of action in the Complaint, the plaintiffs have pleaded five separate torts. For convenience, each of them is described here as a separate cause of action.

**19.** The Restatement (Third) of the Foreign Relations Law of the United States describes the sources of international law as follows:

(1) A rule of international law is one that has been accepted as such by the international community of states

  (a) in the form of customary law;

  (b) by international agreement; or

  (c) by derivation from general principles common to the major legal systems of the world.

(2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.

(3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.

(4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

Restatement (Third) of Foreign Relations Law § 102 (1987)

Foreign Relations Law § 103(1) (1987) (citation omitted).[20] "[S]ubstantial weight" is accorded to the following four categories of secondary evidence in determining whether a rule has become international law:

(a) judgments and opinions of international judicial and arbitral tribunals;

(b) judgments and opinions of national judicial tribunals;

(c) the writings of scholars;

(d) pronouncements by states that undertake to state a rule of international law, when such pronouncements are not seriously challenged by other states.

Restatement (Third) of Foreign Relations Law § 103(2) & cmt. a (1987). In connection with this third category, the Supreme Court has also instructed that evidence of customary international law includes

the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Sosa v. Alvarez–Machain,* —— U.S. ——, ———— ——, 124 S.Ct. 2739, 2766–67, 159 L.Ed.2d 718 (2004) (quoting *Paquete Habana,* 175 U.S. 677, 686, 20 S.Ct. 290, 44 L.Ed. 320 (1900)).[21]

The plaintiffs' first claim is a claim of genocide. The Convention on the Prevention and Punishment of the Crime of Genocide defines genocide as:

any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

(a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures intended to prevent births within the group;

(e) Forcibly transferring children of the group to another group.

Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, art. 2, 102 Stat. 3045, 3045, 78 U.N.T.S. 277,

---

**20.** The evidence used to determine the content of international law is distinct from the sources that create international law. *See* Restatement (Third) of Foreign Relations Law § 103 cmt. a (1987).

Thus, for customary law the "best evidence" is proof of state practice, ordinarily by reference to official documents and other indications of governmental action.... Law made by international agreement is proved by reference to the text of the agreement, but appropriate supplementary means to its interpretation are not excluded.

*Id.* (citation omitted).

**21.** The judgments of international tribunals charged with interpreting international law provide important evidence of the content of international law.

[T]o the extent that decisions of international tribunals adjudicate questions of international law, they are persuasive evidence of what the law is. The judgments and opinions of the International Court of Justice are accorded great weight. Judgments and opinions of international tribunals generally are accorded more weight than those of domestic courts, since the former are less likely to reflect a particular national interest or bias, but the

views of national courts, too, generally have the weight due to bodies of presumed independence, competence, impartiality, and authority. Restatement (Third) of Foreign Relations Law § 103 cmt. b (1987). For example, United States courts that have been required to describe elements of the "law of nations" or other international law concepts have frequently turned to the decisions of the International Criminal Tribunals for the Former Yugoslavia and Rwanda, and have, with apparently only one exception, approved of such decisions. *See, e.g., Doe I,* 395 F.3d at 950; *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1290–93 (11th Cir.2002); *Tagaga v. Immigration & Naturalization Serv.,* 228 F.3d 1030, 1035 n. 10 (9th Cir.2000); *In re Agent Orange,* 2005 WL 555582, at *36, 115; *Liu Qi,* 349 F.Supp.2d at 1331, 1333 n. 48; *Saravia,* 348 F.Supp.2d at 1155; *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 324, 333 (S.D.N.Y.2003); *Cabello Barrueto v. Fernandez Larios,* 205 F.Supp.2d 1325, 1333 (S.D.Fla.2002); *Mehinovic,* 198 F.Supp.2d at 1329 n. 2, 1330 n. 5, 1333 n. 7, 1339 n. 11, 1340 n. 13, 1341 n. 15, 1342 n. 16, 1344 & n. 21, 1346 n. 26, 1347 n. 28, 1351 nn. 39–40, 1352 nn. 41–43, 1353 nn. 45–47, 1354 n. 50, 1356 nn. 62–65. *But see In re South African Apartheid,* 346 F.Supp.2d at 549–50.

280 ("Genocide Convention").[22] International statutes codified more recently contain identical definitions. *See* Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991, S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., art. 4, U.N. Doc. S/RES/827 (1993) ("ICTY Statute"); Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, Between 1 January 1994 and 31 December 1994, S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg., art. 2, U.N. Doc. S/RES/955 (1994) ("ICTR Statute"); Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, art. 6, U.N. Doc. A/CONF.183/9 (1998) ("Rome Statute").

International appellate tribunals charged with interpreting these statutes hold that the intent element of genocide can be inferred from evidence of "a perpetrator's knowing participation in an organized or extensive attack on civilians." *Prosecutor v. Krstic,* No. IT–98–33–A, 2004 WL 2781931 para. 223 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, Apr. 19, 2004).[23] Indeed, "in the absence of direct explicit evidence, [genocidal intent may] be inferred from a number of facts and circumstances, such as the general context, the perpetration of other culpable acts systematically directed against the same group, the scale of atrocities committed, the systematic targeting of victims on account of their membership of a particular group, or the repetition of destructive and discriminatory acts." *Prosecutor v. Jelisec,* No. IT–95–10–A, 2001 WL 34712259 para. 101 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, July 5, 2001). *See also Rutaganda v. Prosecutor,* No. ICTR–96–3–A, 2003 WL 23678345 paras. 526–28 (App. Chamber, Int'l Crim. Trib. for Rwanda, May 26, 2003). Similarly, although "the existence of a plan or policy is not a legal ingredient of the crime of genocide[,] ... the existence of such a plan may help to establish that the accused possessed the requisite genocidal intent." *Krstic,* 2004 WL 2781931 para. 225.

The plaintiffs' fourth claim is for crimes against humanity.[24] The customary interna-

---

**22.** *See also Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosn. & Herz. v. Yugoslavia (Serb. & Mont.)),* 1993 I.C.J. 325 (Provisional Measures Order of Sept. 13) (separate opinion of Judge Lauterpacht). The Genocide Convention also provides:

The following acts shall be punishable:
(a) Genocide;
(b) Conspiracy to commit genocide;
(c) Direct and public incitement to commit genocide;
(d) Attempt to commit genocide;
(e) Complicity in genocide.

Genocide Convention, art. 3. It also provides for liability for "[p]ersons committing genocide or any of the other acts enumerated in article III ..., whether they are constitutionally responsible rulers, public officials or private individuals." *Id.* art. 4.

**23.** The ICTY Appeals Chamber also noted that while "in practice, the perpetrator's genocidal intent will almost invariably encompass civilians, ... that is not a legal requirement of the offence of genocide." *Krstic,* 2004 WL 2781931 para. 226.

**24.** The plaintiffs' second, third, and fifth claims, namely for torture, war crimes, and violations relating to the treatment of ethnic and religious minorities and their property, are not discussed in any further detail in this Opinion. As described in this section, the elements of genocide encourage, and of crimes against humanity require, proof of numerous attacks in order for any one attack to qualify as an instance of genocide or crimes against humanity. By contrast, one instance of torture is all that is required for an individual to claim a law of nations violation. In many cases, war crimes also do not require proof beyond the incident itself, such as a single wanton military attack on an undefended civilian target during wartime. Plaintiffs' claims regarding the treatment of ethnic and religious minorities may or may not require proof beyond the incidents themselves depending on whether they are characterized as collective violations such as genocide, or individual violations such as extrajudicial killing. Collective violations such as genocide and crimes against humanity therefore present more issues of common proof, because the proof of one individual's personal victimization may serve as part of the predicate "widespread attack" proof for another individu-

tional law definition of "crimes against humanity" has evolved since it was first framed for the International Military Tribunal at Nuremberg ("Nuremberg Tribunal"). The Charter of the International Military Tribunal defines crimes against humanity as:

> murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

Charter of the International Military Tribunal, Aug. 8, 1945, art. 6(c), 59 Stat. 1544, 1547, 82 U.N.T.S. 279, 288 (1945) ("Nuremberg Charter").[25] More recent formulations have expanded the range of underlying criminal acts that can form the basis for crimes against humanity while replacing the requirement of a nexus to armed conflict with the requirement that the underlying acts be part of a "widespread" and "systematic" attack. *See* David Luban, *A Theory of Crimes Against Humanity*, 29 Yale J. Int'l L. 85, 95–97 (2004) (describing trend).

The ICTY Statute defines crimes against humanity as

> the following crimes when committed in armed conflict, whether international or internal in character, and directed against any civilian population:
>
> (a) murder;
>
> (b) extermination;
>
> (c) enslavement;
>
> (d) deportation;
>
> (e) imprisonment;
>
> (f) torture;
>
> (g) rape;

> (h) persecutions on political, racial and religious grounds;
>
> (i) other inhumane acts.

ICTY Statute, art. 5. The ICTR Statute, codified one year later, defines crimes against humanity as

> the following crimes when committed *as part of a widespread or systematic attack against any civilian population* on national, political, ethnic, racial or religious grounds:
>
> (a) Murder;
>
> (b) Extermination;
>
> (c) Enslavement;
>
> (d) Deportation;
>
> (e) Imprisonment;
>
> (f) Torture;
>
> (g) Rape;
>
> (h) Persecutions on political, racial and religious grounds;
>
> (i) Other inhumane acts.

ICTR Statute, art. 3 (emphasis supplied). The Rome Statute, codified in 1998, defines crimes against humanity as

> any of the following acts when committed *as part of a widespread or systematic attack directed against any civilian population*, with knowledge of the attack:
>
> (a) Murder;
>
> (b) Extermination;
>
> (c) Enslavement;
>
> (d) Deportation or forcible transfer of population;
>
> (e) Imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law;
>
> (f) Torture;
>
> (g) Rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity;

al's claim, and *vice versa.* Consequently, this Opinion examines the viability of the plaintiffs' genocide and crimes against humanity claims for class certification under Rule 23(b)(3) because their common issues present the best scenario for plaintiffs to meet the predominance requirement. If Rule 23(b)(3) certification is not warranted for these claims based on the predominance of individual issues, it is even less warranted for the plaintiffs' other claims.

**25.** The phrase, "in execution of or in connection with any crime within the jurisdiction of the Tribunal," denotes the other categories of crimes under the subject-matter jurisdiction of the Nuremberg Tribunal, namely, crimes against peace and war crimes. *See* Nuremberg Charter, arts. 6(a) & 6(b).

(h) Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender ..., or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court;

(i) Enforced disappearance of persons;

(j) The crime of apartheid;

(k) Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health.

Rome Statute, art. 7 (emphasis supplied).

Even though the ICTY Statute does not contain the explicit requirement that crimes against humanity be committed as part of a widespread and systematic attack on a civilian population, it is "well established" that "in order to constitute a crime against humanity, the acts of an accused must be part of a *widespread or systematic attack* directed against any civilian population." *Prosecutor v. Blaskic*, No. IT–95–14–A, 2004 WL 2781930 para. 98 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, July 29, 2004) (emphasis supplied). *See also Cabello*, 402 F.3d, at 1161, 2005 WL 580533, at *11; *Prosecutor v. Kordic*, No. IT–95–14/2–A, 2004 WL 3201410 para. 93 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, Dec. 17, 2004); *Prosecutor v. Kunarac*, No. IT–96–23 & IT–96–23/1–A, 2002 WL 32750375 para. 85 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, June 12, 2002); *Prosecutor v. Tadic*, No. IT–94–1–A, 1999 WL 33918295 para. 248 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, July 15, 1999).[26] The requirement that the attack be widespread and systematic is therefore inferred from the ICTY Statute's phrase "directed against any civilian population" based on customary international law. *See Tadic*, 1999 WL 33918295 para. 248 & n. 311.[27]

Accordingly, " 'widespread' refers to the large-scale nature of the attack and the number of targeted persons, while the phrase 'systematic' refers to the organised nature of the acts of violence and the improbability of their random occurrence." *Kordic*, 2004 WL 3201410 para. 94. "Patterns of crimes, in the sense of the non-accidental repetition of similar criminal conduct on a regular basis, are a common expression of such systematic occurrence." *Id.*

Because of the need to prove the existence of a widespread and systematic attack, ICTY trials can take hundreds of days and involve

---

**26.** The ICTY Appeals Chamber also distinguishes the intent element of crimes against humanity from the intent element of genocide, holding that for crimes against humanity,

> the motives of the accused for taking part in the attack *are irrelevant* and a crime against humanity may be committed for purely personal reasons. Furthermore, the accused need not share the purpose or goal behind the attack. It is also irrelevant whether the accused intended his acts to be directed against the targeted population or merely against his victim. It is the attack, not the acts of the accused, which must be directed against the target population and the accused need only know that his acts are part thereof.

*Kordic*, 2004 WL 3201410 para. 99 (citation omitted) (emphasis supplied). *See also* Luban, *supra*, at 97–98.

**27.** The ICTY Statute's requirement that the crimes be "committed in armed conflict, whether international or internal in character," is merely a "jurisdictional element" that must be satisfied for the ICTY to assume jurisdiction over a case. *Tadic*, 1999 WL 33918295 para. 249.

> A nexus between the accused's acts and the armed conflict is not required.... The armed conflict requirement is satisfied by proof that there was an armed conflict; that is all that the Statute requires, and in so doing, it requires more than does customary international law.

*Id.* para. 250. *See also Kunarac*, 2002 WL 32750375 para. 86. "It is by now a settled rule of customary international law that crimes against humanity do not require a connection to international armed conflict." *Prosecutor v. Tadic*, No. IT–94–1–A, 1995 WL 17205280 para. 141 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, Oct. 2, 1995). Indeed,

> customary international law may not require a connection between crimes against humanity and any conflict at all. Thus, by requiring that crimes against humanity be committed in either internal or international armed conflict, the Security Council may have defined the crime in Article 5 more narrowly than necessary under customary international law.

*Id.*

the testimony of hundreds of witnesses. As one prominent jurist has explained,

> Sometimes ... events in many villages or occurring at disparate times are grouped together in a single indictment, requiring an extensive parade of witnesses.... The definition of ... a crime against humanity, or genocide itself requires proof of ... the occurrence of a systematic or widespread campaign against civilians of which the alleged acts are a part, or an intent to destroy a religious, ethnic, or racial group, in whole or in part.

Patricia M. Wald, To "Establish Credible Events by Credible Evidence": The Use of Affidavit Testimony in Yugoslavia War Crimes Tribunal Proceedings, 42 Harv. Int'l L.J. 535, 535 (2001). Consequently, according to Judge Wald, "[a] trial at the ICTY is usually more akin to documenting an episode or even an era of national or ethnic conflict rather than proving a single discrete incident." Id. at 536–37.

### (4) The Predominance of Individual Issues in This Case

■ The plaintiffs have not shown that the common issues will predominate over the individualized issues in this tort action. There are certainly important common issues to be resolved at trial. They include whether the Government of Sudan was engaged in a campaign of genocide and crimes against humanity targeting non-Muslim, African Sudanese (the "Campaign"); whether that Campaign was waged within the Class Area during the Class Period; and whether Talisman was complicit in that Campaign in a way that renders it liable. In this action for damages, however, those common issues constitute only some of the critical issues that will require resolution.

The plaintiffs will have to show with respect to each individual class member that the injuries for which they are claiming damages were actually caused by the Campaign. Given that Talisman intends to show that warfare persisted through much of the Class Period between shifting, protean factions of rival rebel groups based loosely on tribal affiliations, and that such warfare included attacks on villages in the Class Area, proximate causation of each attack will be a hotly contested issue.[28]

The requirement that plaintiffs must prove that each attack was caused by Government or Government-affiliated military forces as part of the Campaign is entirely separate from the issue of establishing the amount of damages to which an individual Class member would be entitled for a particular kind of injury, such as the murder of a relative, torture, rape, or the loss of a residence. Quantifying the damages attributable to an injury is a distinct task from proving that a person was the victim of an attack and from proof of the identity and purpose of the attacker.

Tellingly, the plaintiffs have not described how they would confront the burden of showing causation in a class action trial. The Class is estimated to include between 114,000 and 250,000 members. The Class Period encompasses six and a half years of conflict over a large territory, and at least hundreds, if not thousands, of separate attacks. Although, as indicated above, the Complaint alleges numerous specific attacks that the named representatives experienced, witnessed, or learned of, the Complaint does not contain and the plaintiffs have not tendered a comprehensive list of the attacks the Class suffered or explained how they will develop such a list. It appears, therefore, that they envision simply establishing in a general fashion that the Campaign existed, and will leave for another day proof of specific attacks pursuant to the Campaign that injured individual Class members. It is the need for evidence of such linkage—for evidence of proximate causation—that signals the doom for Rule 23(b)(3) certification. Given that the only way to prove proximate causation is through individualized proof, litigation through representatives will not suffice. The challenge of presenting that individualized proof on behalf of thousands of class members, even if it were logistically feasible, will

---

**28.** Even in the absence of the rebel warfare, plaintiffs would have to show that each death, rape, decision to flee from one's home, etc., for which they seek damages was proximately caused by the Campaign.

quickly dominate the proof regarding the common issues.[29]

The plaintiffs contend that civil rights cases provide ample authority for certification of this action under Rule 23(b)(3). They are wrong. Unless the civil rights litigation arises from physical abuse, it is the mass tort litigation cases described above that are the more analogous lines of cases. Mass tort litigation, and most significantly the *Amchem* decision, *see Amchem*, 521 U.S. 591, 117 S.Ct. 2231, presents an insuperable barrier to certification of a class action under this Class definition. Class certification decisions in mass tort cases fully engage the problems of proximate causation that prohibit certification here.

The plaintiffs rely primarily on two ATS cases and one civil rights case to support certification. This precedent, however, does not advance plaintiffs' case for certification. In *Does I*, the class suffered an identical injury—peonage—from a common source, the garment production system on one island. *Does I*, 2002 WL 1000073, at *7. If the plaintiffs succeeded in showing that the factories enslaved their workers, then liability was established vis-a-vis each worker, and all that remained to be shown would be the amount of an individual's damages. *Hilao*, 103 F.3d 767, which reviewed the creative use of phased proceedings and sampling methods to quantify the damages owed by Marcos to almost ten thousand Filipinos he had injured, preceded *Amchem* and would be unlikely to survive today. The dissent in *Hilao* was the better reasoned decision and identified the very problems that infect this

application for certification. *Id.* at 787. To paraphrase that dissent, there may be little question that the Government of Sudan caused tremendous harm to the people of southern Sudan, but the question is which people and how much. *See id.* at 788.

The sole civil rights case on which plaintiffs rely provides them with little solace. In *Robinson*, 267 F.3d 147, the Second Circuit reviewed a decision denying certification for a pattern and practice disparate treatment claim and for a disparate impact claim, both brought under Title VII. *Id.* at 158, 160. The Second Circuit held that it was error not to certify the liability stage of the pattern and practice disparate impact claim pursuant to Rules 23(b)(2) and (c)(4)(A), and not to certify the disparate impact claim pursuant to Rule 23(b)(2). *Id.* at 169–70. *Robinson* did not have to grapple with the issue of predominance inherent in the Rule 23(b)(3) inquiry.[30]

The plaintiffs further argue that causation is not an impediment to certification because they have alleged that *all* of the attacks in the Class Area were caused by the Campaign and that that allegation must be accepted without further scrutiny during the decision on certification. They argue that because it is not appropriate to evaluate the merits of a case at the certification stage, Talisman's contention that there were other sources of bloodshed in the Class Area during the Class Period cannot be considered. This argument misperceives the nature of a Rule 23(b)(3) inquiry. While class certification is not an occasion for *deciding* the merits of a party's case, courts may not accept all of the allega-

---

**29.** It is true that plaintiffs' causes of action for genocide and crimes against humanity encourage and require, respectively, proof of numerous attacks in order for any one attack to qualify as an act of genocide or a crime against humanity. It is unnecessary to decide today whether a significantly narrowed class definition to include only individuals who were injured in identified attacks that were part of a widespread pattern could be certified, since the plaintiffs have not attempted to limit the class.

**30.** Indeed, to the extent that civil rights cases could be relevant to the analysis of this Opinion, a more appropriate comparison would be with *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir.1999). In *Blyden*, the Second Circuit stated that the district court's certification of a Rule 23(b)(3)

class action, brought by prisoners injured in various ways during a prison riot, produced "illusory" benefits because the case "bristle[d] with individual issues." *Id.* at 271. The court noted that the second phase damages juries had been improperly forced to decide liability issues that were left unresolved at the end of the initial liability phase trial, *id.*, and that even if the liability phase had been conducted properly, "[o]ne may question ... whether the complexity of such a trial and the special verdict it would entail might not have outweighed any benefits." *Id.* Because the court reversed the judgment on other grounds, it remanded the certification issue for further consideration, expressing its doubt as to "the wisdom" of certification. *Id.* at 272.

tions of a complaint as true while simultaneously ignoring the existence of defenses. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675–76 (7th Cir.2001). Identifying subjects that will be contested at trial and evaluating each party's burden of proof on the elements of its cause of action or defense is not the same as concluding which party will ultimately prevail. "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364. Indeed, it was the existence of a defense that allowed the Second Circuit to affirm the certification of a class in *In re Agent Orange*, 818 F.2d 145. The plaintiffs cannot hide behind their allegations in order to avoid an issue that will play a central role in Talisman's defense, especially not at the conclusion of over two years of discovery. To hold otherwise would reduce the "rigorous" class certification process to a mere formality. *See In re Visa Check/MasterMoney*, 280 F.3d at 135. In any event, the dilemma of proving proximate causation would exist in this case even in the absence of the inter-tribal warfare that Talisman trumpets.

The plaintiffs also contend that the issue of generic causation can be separated from the issue of individual causation, with the individual causation issues reserved for separate, later treatment. They rely on *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748(PKC), 2004 WL 2754674 (S.D.N.Y. Dec.1, 2004); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir.2002), *Mejdrech*, 319 F.3d at 911; and *Sterling*, 855 F.2d at 1199. *In re Globalstar*, a securities litigation, and *In re Linerboard*, an antitrust litigation, are inapposite

because statutes and common law facilitate class-wide proof of causation in securities and antitrust cases by creating presumptions that may be rebutted by defendants in later trial phases. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 288–297 (S.D.N.Y.2003) (presumption of individual reliance obviates individual issue predominance); *In re Linerboard*, 305 F.3d at 152–53 (presumption of individual impact obviates individual issue predominance). These presumptions essentially permit class-wide proof to create rebuttable prima facia cases for all class members, which is why, unlike in mass tort cases, which do not contain such presumptions, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.[31]

*Mejdrech* and *Sterling* are also inapposite. As noted above, both cases involved single-source ground chemical leaks in a limited and defined area that unified the claims across the class. *See Mejdrech*, 319 F.3d at 911; *Sterling*, 855 F.2d at 1197.

Finally, the plaintiffs contend that class certification will not result in any unfair prejudice to the defendants since class members can be required in any administrative phase that follows trial to prove that they were harmed by the defendants and not by a rebel army. This suggests that the plaintiffs anticipate using a trial phase to prove in a general way that the defendants waged the Campaign described above, followed by an administrative phase where each Class member must show that he was harmed by Government, not rebel, forces or some private actor. This, however, is precisely the type of scenario that could prejudice defendants by

---

**31.** The plaintiffs contend that in the event they establish a policy or pattern of conduct by the defendants, that class members should be entitled to a presumption that any injury they sustained was caused by the defendants. Plaintiffs offer no compelling reason why they should be entitled to such a presumption, as they draw support for their argument from an entirely different area of jurisprudence: employment discrimination cases. *See Warren v. Xerox Corp.*, No. 01–CV–2909 (JG), 2004 WL 1562884, at *14 (E.D.N.Y. Jan.26, 2004); *Robinson*, 267 F.3d at 157–59. The requirement that "proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is

consistent with the manner in which presumptions are created generally." *Williams v. Anderson*, 562 F.2d 1081, 1088 (8th Cir.1977). "Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." *Id. See also Basic, Inc. v. Levinson*, 485 U.S. 224, 245–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 375 (2d Cir.1973). There is no logical or factual support for a presumption that every death, rape, or abandonment of a homestead must be caused by genocide or crimes against humanity.

"lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury." *In re Fibreboard,* 893 F.2d at 712. In such a scenario, the jury trial would become but a precursor to a capacious administrative morass where the majority of substantive issues of causality would be resolved on a piecemeal basis.

Although the calamitous suffering and appalling treatment of Sudan's African population is well-documented, the predominance inquiry ultimately "trains on the legal or factual questions that qualify each class member's case as a genuine controversy." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. The core question establishing a genuine controversy in this case is whether the suffering endured by each putative class member can be attributed to the defendants. That is fundamentally an individual question.

## CONCLUSION

The Rule 23(b) requirements for certification of a class action have not been satisfied. The plaintiffs' motion to certify the Class is denied.

SO ORDERED.